No. 108,353

JASON MASHANEY, *Appellant*, v. BOARD OF INDIGENTS' DEFENSE SERVICES, SARAH E. SWEET-MCKINNON, and VIRGINIA A. GIRARD-BRADY, *Appellees*.

(355 P.3d 667)

Opinion filed August 28, 2015.

*Larry G. Michel*, of Kennedy Berkley Yarnevich & Williamson, Chartered, of Salina, argued the cause, and *Angela D. Coble*, of the same firm, was with him on the briefs for appellant.

*Marty M. Snyder*, assistant attorney general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the briefs for appellee Board of Indigents' Defense Services.

*Timothy J. Finnerty*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, argued the cause, and *Charles E. Hill*, of the same firm, was with him on the briefs for appellee Sarah Sweet-McKinnon.

*Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, argued the cause, and *Sylvia B. Penner*, of the same firm, was with him on the briefs for appellee Virginia Girard-Brady.

The opinion of the court was delivered by

BEIER, J.: This case presents the question of whether a criminal defendant, whose conviction has been reversed in a K.S.A. 60-1507 proceeding and who has entered a plea to different charges pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), may pursue a legal malpractice claim against trial and appellate counsel without first demonstrating actual innocence. We also are asked to decide whether the Board of Indigents' Defense Services (BIDS) is subject to suit in the malpractice action and whether suit was timely filed under the applicable statute of limitations.

We affirm the district court judge's decision that BIDS cannot be a party defendant but otherwise reverse. Proof of actual innocence is not required to pursue a legal malpractice claim of this type, and this action was timely filed.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2003, the State charged Jason Mashaney with one count of aggravated criminal sodomy and one count of aggravated indecent liberties with a child based on allegations made by the mother of Mashaney's 5-year-old daughter. The State later amended the complaint to add an alternative count of aggravated indecent liberties.

The district court appointed Sarah Sweet-McKinnon of the Sedgwick County Public Defender's Office to serve as Mashaney's trial counsel. After Mashaney's first jury trial ended in a mistrial, the case proceeded to a second jury trial. On July 9, 2004, the jury convicted Mashaney.

Before sentencing, Mashaney filed a pro se motion to set aside the verdict based on ineffective assistance of counsel. Mashaney made a number of general allegations to support his argument that Sweet-McKinnon's representation had been deficient. The district court judge appointed new defense counsel and held an evidentiary hearing on Mashaney's motion on November 17, 2004. The judge denied the motion and sentenced Mashaney to 442 months' imprisonment.

Virginia A. Girard-Brady of the Appellate Defender's Office represented Mashaney in his appeal. The Court of Appeals denied Mashaney relief, and this court denied a subsequent petition for review. See *State v. Mashaney*, No. 94,298, 2007 WL 1109456 (Kan. App. 2007) (unpublished opinion), *rev. denied* 284 Kan. 949 (2007). Ineffective assistance of trial counsel was not an issue raised on appeal.

On April 11, 2008, Mashaney filed a pro se K.S.A. 60-1507 motion in which he alleged ineffective assistance of both trial and direct appeal counsel. The motion was denied summarily 6 months later. Mashaney appealed the denial to the Court of Appeals. The Court of Appeals reversed and remanded the case to the district court for an evidentiary hearing. See *Mashaney v. State*, No. 101,978, 2010 WL 3731341 (Kan. App. 2010) (unpublished opinion). After the hearing, the district judge granted Mashaney's K.S.A. 60-1507 motion on April 11, 2011. Mashaney's case went back onto the trial calendar.

Mashaney and the State entered a plea agreement on December 28, 2011. Mashaney agreed to enter an *Alford* plea, see 400 U.S. at 37, on two counts of attempted aggravated battery and one count of aggravated endangering a child. In exchange, the State dropped the original charges. The district judge accepted Mashaney's plea and, on February 24, 2012, sentenced him to 72 months' imprisonment. Because Mashaney had already served more than 72 months of his original 442-month sentence, he was released from custody.

Between entering into the plea agreement and sentencing, on January 13, 2012, Mashaney filed this legal malpractice action against Sweet-McKinnon, Girard-Brady, and BIDS. The bases for

Mashaney's claim against Sweet-McKinnon were similar to the grounds for his ineffective assistance of counsel claim in his K.S.A. 60-1507 motion. As to Girard-Brady, Mashaney alleged she had committed malpractice by failing to raise the issue of Sweet-McKinnon's ineffective assistance on direct appeal. On BIDS, Mashaney alleged that it had breached its duty "to provide for effective assistance of counsel to its clients through the selection, training, and supervision of capable attorneys." Mashaney asserted that he had always denied abusing his daughter. He also asserted that, as a result of defendant's malpractice, he had been "improperly convicted in 2004 and was therefore forced to serve nearly eight (8) years in prison, which would not have occurred had he received proper representation." Mashaney sought $1,600,000 in economic and non-economic damages.

Sweet-McKinnon and Girard-Brady raised affirmative defenses in their answers to Mashaney's petition. Sweet-McKinnon contended that Mashaney was estopped from pursuing his negligence claim by the 2011 *Alford* plea. Girard-Brady also asserted that Mashaney's claims were barred by virtue of his guilty plea. In addition, she claimed Mashaney filed his suit beyond the statute of limitations. Both Sweet-McKinnon and Girard-Brady moved for judgment on the pleadings. BIDS moved to dismiss on the ground that it lacked the capacity to be sued.

District Judge Douglas R. Roth granted the defendants' motions. He agreed with BIDS that it lacked the capacity to be sued. He also ruled that Mashaney's *Alford* plea foreclosed the relief sought. With the parties' blessing, Judge Roth also decided to "tee it up for the appellate court" and ruled that Mashaney's claim was time barred.

On appeal to the Court of Appeals, Mashaney challenged each of the three district court rulings. See *Mashaney v. Board of Indigents' Def. Servs.*, 49 Kan. App. 2d 596, 313 P.3d 64 (2013). All three panel members agreed that BIDS lacked the capacity to be sued. All three disagreed that Mashaney's claim was time barred, because a criminal defendant's cause of action for legal malpractice does not accrue until the defendant's conviction is overturned. Because Mashaney filed his malpractice suit within 2 years after his

K.S.A. 60-1507 motion was granted in district court, the panel ruled that his claim was timely filed. But the panel split on the effect of Mashaney's *Alford* plea. The majority held that a criminal defendant must prove actual innocence in order to pursue a malpractice action and that Mashaney's plea foreclosed the possibility of marshaling such proof. Judge G. Gordon Atcheson wrote a lengthy dissenting opinion criticizing the majority's reliance on the actual innocence rule. 49 Kan. App. 2d at 622-46.

Mashaney petitioned this court for review of the panel's unanimous holding that BIDS lacked the capacity to be sued and the panel majority's holding that his *Alford* plea precluded his suit because of the actual innocence rule. BIDS, Sweet-McKinnon, and Girard-Brady cross-petitioned for review of the panel's holding that Mashaney's malpractice action was timely.

We granted Mashaney's petition and the defendants' cross-petitions.

## DISCUSSION

### *BIDS Lacks the Capacity to be Sued*

Because the capacity of a subordinate government agency to sue or be sued turns on statutory interpretation, this court's review of the BIDS issue is unlimited. See *Cheney v. Poore*, 301 Kan. 120, 125, 339 P.3d 1220 (2014) (statutory interpretation question of law subject to unlimited review).

BIDS is a subordinate government agency created within the Kansas executive branch. See K.S.A. 22-4519(a) (creating BIDS).

"Subordinate government agencies, in the absence of statutory authorization, ordinarily do not have the capacity to sue or be sued. *Hopkins v. State*, 237 Kan. 601, 606, 702 P.2d 311 (1985). The statutory authority [for suit] need not be express, but can be implied. See *Board of Library Directors v. City of Ft. Scott*, 134 Kan. 586, 588, 7 P.2d 533 (1932)." *Lindenman v. Umscheid*, 255 Kan. 610, 628-29, 875 P.2d 964 (1994).

Mashaney concedes that there is no express statutory authorization vesting BIDS with the capacity to sue or be sued, but he urges this court to "delve beyond the surface" of the Indigents' Defense Services Act, K.S.A. 22-4501 *et seq.*, to find such authority.

Mashaney primarily relies on K.S.A. 22-4522(a), which requires BIDS to "[p]rovide, supervise and coordinate, in the most efficient and economical manner possible, the constitutionally and statutorily required counsel and related services for each indigent person accused of a felony and for such other indigent persons as prescribed by statute." According to Mashaney, BIDS had an affirmative duty to provide him with competent counsel and to supervise that counsel. But, as the Court of Appeals noted, K.S.A. 22-4520 expressly forbids BIDS from making any decision regarding the handling of any case and from interfering with counsel in carrying out his or her professional duties. 49 Kan. App. 2d at 601. The supervision contemplated in K.S.A. 22-4522(a) is not the type Mashaney wishes to rely upon to expose BIDS to malpractice liability.

Mashaney also contends that "the forces of equity in the absence of statutory direction demand that BIDS be subject to suit" because "it is repugnant to allow [BIDS] to appoint and supervise ineffective counsel, yet then lack accountability for said supervision." Mashaney cites no authority for this novel theory of liability, and, again, his argument is premised on a misconception about the supervision BIDS exercises over appointed counsel.

The Court of Appeals correctly held that BIDS lacked the capacity to be sued. 49 Kan. App. 2d at 601.

*Statute of Limitations*

"The interpretation and application of a statute of limitations is a question of law over which an appellate court exercises unlimited review." *Schoenholz v. Hinzman*, 295 Kan. 786, 791, 289 P.3d 1155 (2012).

Mashaney's legal malpractice claim is governed by K.S.A. 60-513(a)(4) and its 2-year statute of limitations. See *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 86, 716 P.2d 575 (1986) (where essential claim of action is breach of duty imposed by law upon relationship of attorney/client, action in tort). And K.S.A. 60-513(b) provides that a legal malpractice claim

"shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably

ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

In *Pancake House*, this court explained that "a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises. . . . [A]n action accrues [when] the plaintiff could first have filed and prosecuted his action to a successful conclusion." 239 Kan. at 87.

In the context of a legal malpractice claim, the *Pancake House* court identified "four theories which can apply to attorney mal-practice in Kansas as to when the accrual of a cause of action occurs and the statute of limitations begins to run." 239 Kan. at 87.

"(1) The occurrence rule—the statute begins to run at the occurrence of the lawyer's negligent act or omission.

"(2) The damage rule—the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his law-yer's conduct.

"(3) The discovery rule—the statute does not begin to run until the client discov-ers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

"(4) The continuous representation rule—the client's cause of action does not accrue until the attorney-client relationship is terminated." 239 Kan. at 87.

The determination of which theory applies depends upon the facts and circumstances of each case. 239 Kan. at 87.

In *Canaan v. Bartee*, 276 Kan. 116, 120, 72 P.3d 911, *cert. de-nied* 540 U.S. 1090 (2003), we considered "[w]hether a plaintiff must be exonerated in postconviction proceedings *before bringing* a legal malpractice action against his criminal defense attorney." (Emphasis added.)

The plaintiff in *Canaan*, Marvin Canaan, had been convicted of first-degree murder and other crimes and sentenced to life in prison. He filed a legal malpractice suit against his criminal defense attorney. The attorney filed a motion for summary judgment ar-guing that Canaan's cause of action had not yet accrued because he had not obtained postconviction relief. The district court judge granted the motion. After transfer to this court from the Court of

Appeals, we recognized a split in authority. Compare *Levine v. Kling*, 123 F.3d 580, 583 (7th Cir. 1997) (applying Illinois law); *Shaw v. State, Dept. of Admin., PDA*, 816 P.2d 1358, 1360 (Alaska 1991); *Steele v. Kehoe*, 747 So. 2d 931, 933 (Fla. 1999); *Berringer v. Steele*, 133 Md. App. 442, 484, 758 A.2d 574 (2000); *Morgano v. Smith*, 110 Nev. 1025, 1029, 879 P.2d 735 (1994); *Stevens v. Bispham*, 316 Or. 221, 238, 851 P.2d 556 (1993); *Bailey v. Tucker*, 533 Pa. 237, 251, 621 A.2d 108 (1993); *Gibson v. Trant*, 58 S.W.3d 103, 117 (Tenn. 2001); *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 497-98 (Tex. 1995); *Adkins v. Dixon*, 253 Va. 275, 281-82, 482 S.E.2d 797 (1997), with *Mylar v. Wilkinson*, 435 So. 2d 1237 (Ala. 1983); *Silvers v. Brodeur*, 682 N.E.2d 811, 818 (Ind. App. 1997); *Gebhardt v. O'Rourke*, 444 Mich. 535, 548, 510 N.W.2d 900 (1994); *Duncan v. Campbell*, 123 N.M. 181, 186, 936 P.2d 863 (Ct. App. 1997); *Krahn v. Kinney*, 43 Ohio St. 3d 103, 105, 538 N.E.2d 1058 (1989). Finding the majority position persuasive, we adopted the "exoneration rule," which required "[a] person convicted in a criminal action [to] obtain postconviction relief before maintaining an action alleging malpractice against his or her former criminal defense attorneys." 276 Kan. 116, Syl. ¶ 2.

Our *Canaan* decision implicitly defined "exoneration" as a legal concept, not a moral or ethical one. Exoneration requires the lifting of criminal liability by vacation or reversal of a conviction, regardless of whether the vacation or reversal is compelled by a successful assertion of actual innocence. It thus appears that the "exoneration rule" of *Canaan* might be more accurately termed the "vindication rule." But we do not depart from *Canaan*'s terminology today.

*Canaan* did not involve a statute of limitations issue, but we noted that one of the policy reasons supporting adoption of an exoneration rule was its potential to create "a bright line rule determining when the statute of limitations runs on the malpractice action." 276 Kan. at 123. In short, the requirement that a criminal defendant who seeks to become a civil plaintiff in a legal malpractice action first obtain vacation or reversal of his or her conviction or another court decision otherwise vindicating or recognizing the injury the defendant has suffered because of counsel's error or errors gives us a date certain when proof for all of the elements of

a malpractice case—duty, breach, causation, and damages—is available. Using the date of the court's decision in the defendant's favor in the criminal action as the date of accrual of the cause of action for legal malpractice in the civil realm most nearly fits under our *Pancake House* precedent. See 239 Kan. at 87. In essence, the *Canaan* exoneration rule does not accept the criminal client's unilateral discovery of "the material facts essential to his cause of action against the attorney." 239 Kan. at 87. Such discovery must be validated by some form of relief from conviction. As we put it in *Canaan*,

"the adoption of the exoneration rule could be construed simply as a recognition that a plaintiff has no cause of action until he or she can establish the causation element of his or her claim. In other words, until a plaintiff has been exonerated, his or her criminal conduct and not his or her attorney's negligence is the proximate cause of his or her incarceration." 276 Kan. at 131.

In this case, the panel relied upon *Canaan* to conclude that Mashaney's civil cause of action for legal malpractice accrued when Mashaney obtained relief from his convictions. Because he filed his malpractice claim within 2 years of April 11, 2011, the date his K.S.A. 60-1507 motion was granted, and within 10 years of the Sweet-McKinnon and Girard-Brady conduct giving rise to the claim, the panel held that his action was timely.

We agree with the panel's general approach. "A cause of action accrues when the right to institute and maintain a suit arises, or when there is a demand capable of present enforcement." *Holder v. Kansas Steel Built, Inc.*, 224 Kan. 406, 410, 582 P.2d 244 (1978); see *Pancake House*, 239 Kan. at 87 ("true test" of accrual determines point at which plaintiff could first have filed, prosecuted action to successful conclusion). Under *Canaan* and its exoneration rule, a criminal defendant cannot pursue a legal malpractice action that seeks to hold counsel responsible for a conviction until that conviction is reversed on the basis of ineffective assistance. 276 Kan. 116, Syl. ¶ 2. Accordingly, any legal malpractice claim does not accrue until that point. *Cf. Martin v. Naik*, 297 Kan. 241, 255, 300 P.3d 625 (2013) ("[B]ecause an anticipatory wrongful death action cannot be brought, an accrual of the action before death would be unreasonable.").

This does not complete our analysis in this case, however. The procedural history of *Canaan* differed from that before us here. The defendant in *Canaan* had failed to obtain *any* relief from his conviction, achieved through a postconviction motion or otherwise, before filing his malpractice action. This meant we were not called upon to decide how thorough and permanent relief must be to trigger legal exoneration and thus accrual of his malpractice action. Here, in contrast, we must go further. Mashaney did obtain relief from his original convictions through his K.S.A. 60-1507 motion, and we must therefore decide if the district judge's April 11, 2011, order was adequate legal exoneration. Was additional, final action disposing of the case against Mashaney required?

Courts in our sister states have differed on the answer to this question.

In at least two jurisdictions, courts have explicitly held that reversal of a conviction that is potentially temporary is insufficient to qualify as legal exoneration.

In *Rogers v. Cape May Cnty. Office of Pub. Defender*, 208 N.J. 414, 425, 31 A. 3d 934 (2011), the Supreme Court of New Jersey held that exoneration sufficient to support a legal malpractice claim required the ultimate dismissal of the underlying criminal case against the defendant with prejudice; mere reversal of the defendant's conviction was not enough.

And, in *Cira v. Dillinger*, 903 So. 2d 367, 371 (Fla. Dist. App. 2005), the court ruled that "the reversal of a conviction on direct appeal or the entry of an order for postconviction relief does not necessarily result in the exoneration." After noting the policy reasons articulated by the Florida Supreme Court when it adopted the exoneration rule, the *Cira* court held that a legal malpractice plaintiff must establish the final disposition of the underlying criminal case in his or her favor in addition to obtaining postconviction relief.

"We begin by noting that the relief available on the reversal of a conviction on direct appeal or on the entry of an order for postconviction relief is highly variable. A reversal of a conviction on appeal or a successful motion for postconviction relief may occasionally result in a dismissal of all pending charges. However, far more common results include the grant of a new trial or an order for resentencing.

Following the grant of a new trial, the defendant may be acquitted or convicted again on the same or lesser charges after a second trial. In some instances, the prosecutor may decline to try the case again and nolle prosequi the charges. Or, as in this case, the defendant may plead nolo contendere or guilty to the same or lesser charges and be sentenced again. As a result, the consequences stemming from the reversal of a conviction on direct appeal or the entry of an order for postconviction relief are often indeterminate. Absent an order of dismissal, the pending criminal charges cannot be finally disposed of until further proceedings are held.

"It follows that the reversal of a conviction on direct appeal or the entry of an order for postconviction relief does not necessarily result in the exoneration of a criminal defendant. To 'exonerate' means '[t]o free from blame; to exculpate; also, to relieve from the blame or burden of; to relieve or set free from (blame, reproach).' V *The Oxford English Dictionary* 548 (2d ed. 1989). The reversal of a conviction on direct appeal or the entry of an order for postconviction relief may occasionally-but will not generally-exculpate or free a defendant in a criminal case from blame. Exoneration will most often not occur, if at all, until further proceedings are held. Because of the variety of outcomes that may follow reversal of a conviction on appeal or the entry of an order for postconviction relief, we conclude that proof of appellate or postconviction relief, without more, is insufficient to satisfy the exoneration requirement. The legal malpractice plaintiff must also establish the final disposition of the underlying criminal case in his or her favor. This conclusion is consistent with the policy arguments our supreme court noted when it adopted the exoneration rule, specifically the argument that 'without obtaining relief from the conviction or sentence, the criminal defendant's own actions must be presumed to be the proximate cause of the injury.' [Citation omitted.]" *Cira*, 903 So. 2d at 371-72.

Of these two jurisdictions, one, Florida, also requires that a criminal defendant prove actual innocence as an element of any civil malpractice claim. See *Schreiber v. Rowe*, 814 So. 2d 396, 399 (Fla. 2002). And we note that courts in three other jurisdictions appear to link the concepts of exoneration and actual innocence. See *Coscia v. McKenna & Cuneo*, 25 Cal. 4th 1194, 1205, 108 Cal. Rptr. 2d 471, 25 P.3d 670 (2001) (relief in form of final disposition of criminal case prerequisite to exoneration, proving actual innocence); *Britt v. Legal Aid Soc. Inc.*, 95 N.Y.2d 443, 448, 718 N.Y.S.2d 264, 741 N.E.2d 109 (2000) (only when "criminal proceeding has been terminated without conviction" can exoneration occur, innocence be asserted); *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 497-98 (Tex. 1995) (exoneration required, blended

with need for proof of actual innocence). We address whether Kansas will follow the actual innocence rule in the following section of our discussion below. Suffice it to say here that we reject equivalence between it and the concept of legal exoneration in the same way that we reject equivalence between legal exoneration and moral purity.

The procedural history in a case from a third jurisdiction, Arizona, implies that exoneration must be final before it can give rise to a civil malpractice action. See *Glaze v. Larsen*, 207 Ariz. 26, 83 P.3d 26 (2004). In that case, the court had dismissed the criminal case against the defendant with prejudice, so there was no question that any finality requirement for the exoneration rule had been met. 207 Ariz. at 32. The court also observed that exoneration could be achieved through a variety of procedural mechanisms. 207 Ariz. at 32.

Meanwhile, courts in at least six other states—Alaska, Illinois, Minnesota, Nevada, Oregon, and Washington—have held that a court decision erasing a criminal conviction on the basis of ineffective assistance of counsel gives rise to legal exoneration and thus to accrual of the defendant's civil malpractice claim against his or her lawyer. See *Shaw v. State Dep't of Admin., Pub. Defender Agency*, 816 P.2d 1358, 1361 (Alaska 1991) (any postconviction relief equals exoneration; "[b]y adopting the date that [postconviction] relief is obtained as the trigger to the statute of limitations, we establish a bright line test which should significantly assist courts"); *Griffin v. Goldenhersh*, 323 Ill. App. 3d 398, 407, 752 N.E.2d 1232 (2001) (legal malpractice claim accrued upon mandate of court reviewing ineffective assistance of counsel claim); *Noske v. Friedberg*, 656 N.W.2d 409, 414 (Minn. App.), *aff'd* 670 N.W.2d 740 (Minn. 2003) (date of conviction relief triggers accrual of malpractice action; desirable bright line rule undercut if made contingent on whether State decides to retry); *Clark v. Robison*, 113 Nev. 949, 951, 944 P.2d 788 (1997) (once relief from conviction granted, statute of limitations for legal malpractice claim begins to run); *Stevens v. Bispham*, 316 Or. 221, 239, 851 P.2d 556 (1993) (exoneration date the same as date conviction set aside by court on basis of another person's confession); *Falkner v. Foshaug*,

108 Wash. App. 113, 118-19, 29 P.3d 771 (2001) (appellate court's reversal of conviction on ineffective assistance grounds gave rise to legal malpractice action); see also *Johnson v. Babcock*, 206 Or. App. 217, 223-24, 136 P.3d 77, *rev. denied* 341 Or. 450, 143 P.2d 773 (2006) (grant of federal habeas relief after unsuccessful state post-conviction proceeding established exoneration date).

Three jurisdictions—New Hampshire, Tennessee, and Virginia—although they require exoneration before a legal malpractice action accrues, have not weighed in on the question of whether any relief from conviction must be absolutely and finally determinative of the underlying criminal case. See *Therrien v. Sullivan*, 153 N.H. 211, 216, 891 A.2d 560 (2006) (opinion unclear on whether accrual occurred at time of order of relief or at time State decided not to re-prosecute; mention of bright-line rule suggests order's timing critical); *Gibson v. Trant*, 58 S.W.3d 103, 111 (Tenn. 2001) (adopting exoneration rule; because defendant had not obtained any type of postconviction relief, court did not outline particulars); *Adkins v. Dixon*, 253 Va. 275, 282, 482 S.E.2d 797 (1997) (case properly dismissed for failure to allege any form of postconviction relief; statute "does not begin to run until termination of the postconviction proceeding").

And, finally, the Court of Appeals of Indiana has identified imperfection in all rules governing when adequate exoneration occurs for accrual of a malpractice action. In *Silvers*, the court observed:

"We also note that an attempt to establish an easy, bright-line test for determining the accrual of the statute of limitations by requiring exoneration fails in its application. In particular, those states which require exoneration do not specify at what point a criminal defendant is exonerated: when he achieves successful post-conviction relief, when he is retried and a different result is achieved, or when he can no longer be retired for the same crime. To simply require successful post-conviction relief ignores the fact that a defendant may be retried and convicted of the same or a similar crime. Similarly, some defendants will never be retried and, therefore, will never obtain a different result. Finally, to prohibit a malpractice claim until a criminal defendant can no longer be tried for the crime would, among other problems, essentially deny relief for those previously convicted of murder, as murder has no statute of limitations." 682 N.E.2d at 818.

Recognizing that perfect can be the enemy of good, we are reluctant to throw up our hands in defeat per *Silvers*. Rather, we are

most persuaded by the opinions of the six jurisdictions that select the date of the court decision reversing or vacating a conviction as the point in time when exoneration occurs and the civil cause of action accrues. We also are influenced by the fact that at least two other jurisdictions have implied that they too would adopt a rule consistent with the six. As these courts have observed, this rule establishes as bright a line as is possible. No such bright line is discernible if exoneration and accrual are contingent on whether the State decides to continue or revive prosecution of the defendant, a decision that may be made promptly or never, depending on whether there is pressure from a statute of limitations. No such bright line is discernible if exoneration and accrual are dependent on whether a particular generation of prosecutors are willing to be forthcoming about their plans.

After careful consideration of the competing authorities from other states, we hold that a Kansas criminal defendant is "exonerated" for purposes of accrual of his or her civil legal malpractice claim against counsel on the date that a court grants relief from the conviction on the basis of ineffective assistance of counsel. That relief may come as the result of a K.S.A. 60-1507 motion or some other procedural mechanism in the district court or in one of the appellate courts.

*Actual Innocence Rule*

The last issue on this appeal arose in the motions for judgment on the pleadings filed by Sweet-McKinnon and Girard-Brady.

"A motion for judgment on the pleadings under 60-212(c), filed by a defendant, is based upon the premise that the moving party is entitled to judgment on the face of the pleadings themselves and the basic question to be determined is whether, upon the admitted facts, the plaintiffs have stated a cause of action. [Citation omitted.] The motion serves as a means of disposing of the case without a trial where the total result of the pleadings frame the issues in such manner that the disposition of the case is a matter of law on the facts alleged or admitted, leaving no real issue to be tried. [Citation omitted.] The motion operates as an admission by movant of all fact allegations in the opposing party's pleadings. [Citations omitted.]" *Clear Water Truck Co. v. M. Bruenger & Co.*, 214 Kan. 139, 140, 519 P.2d 682 (1974).

An appellate court's review of whether the district court properly granted a motion for judgment on the pleadings is unlimited. *Wagner v. State*, 46 Kan. App. 2d 858, 860, 265 P.3d 577 (2011).

The district judge granted the individual defendants' motions, ruling that Mashaney was required to prove actual innocence to prevail on his legal malpractice claim and that he would be unable to do so, given his *Alford* plea to charges different from those supporting his reversed convictions. The judge correctly recognized that *Canaan* "stopped short of deciding whether the exoneration must be accompanied by proof of actual innocence." But he believed Kansas would join the ranks of those jurisdictions that require proof of actual innocence in malpractice lawsuits brought by dissatisfied criminal defense clients.

In *Canaan*, we identified the elements of a legal malpractice claim:

" '(1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage.' *Bergstrom v. Noah*, 266 Kan. 847, 874, 974 P.2d 531 (1999). In addition to those four elements, to prove legal malpractice in the handling of litigation, a plaintiff must establish the validity of the underlying claim by showing that it would have resulted in a favorable judgment in the underlying lawsuit had it not been for the attorney's error. *Webb v. Pomeroy*, 8 Kan. App. 2d 246, 249, 655 P.2d 465 (1982)." *Canaan*, 276 Kan. at 120.

The Court of Appeals majority in this case used examples to mark the distinction between the innocence required to be proved under the actual innocence rule and the legal exoneration required for accrual of the cause of action:

"[I]t may be clear that a defendant accused of murder intentionally took the victim's life, but the defendant may have a jurisdictional defense based on the fact that the murder did not occur in the jurisdiction where the defendant was tried. The defendant may be exonerated by an appellate court setting aside the defendant's conviction, and the criminal defendant can rightly claim that the outcome of the case would have been more favorable but for the attorney's negligence, but that hardly constitutes the establishment of actual innocence.

"Similarly, a criminal defendant may be caught red-handed in the midst of a burglary. But if the State is dilatory in prosecuting the action, the defendant may have an absolute defense under our speedy trial requirements. If defense counsel failed to raise the speedy trial defense, the criminal defendant may be exonerated when the court later sets aside the conviction because defense counsel was inef-

fective in not raising this defense. But this clearly does not establish that the defendant was innocent of the charge." *Mashaney*, 49 Kan. App. 2d at 612.

The panel majority asserted that many of the policy reasons underlying the adoption of the exoneration rule in *Canaan* applied "equally to the adoption of an actual innocence requirement." *Mashaney*, 49 Kan. App. 2d at 613. Those policies include:

" 'equitable principles against shifting responsibility for the consequences of the criminal action; the paradoxical difficulties of awarding damages to a guilty person; theoretical and practical difficulties of proving causation; . . . preserving judicial economy by avoiding relitigation of settled matters; . . . availability of alternative postconviction remedies; and the chilling effect on thorough defense lawyering.' " 49 Kan. App. 2d at 613 (quoting *Canaan*, 276 Kan. at 123).

The panel majority then turned to cases outside of our jurisdiction that have adopted the actual innocence requirement. It used these authorities, the majority among those that have considered the question, to argue that skillful representation may lead to an acquittal or a reduced sentence but that a guilty defendant has no right to such result. The panel majority also made the policy arguments that civil recovery should not become a tool to shift an individual's responsibility for his or her criminal acts to counsel and that a guilty criminal defendant should not be permitted to recover a money judgment against a criminal defense lawyer that essentially compensates the defendant for the punishment imposed upon him or her for criminal conduct. *Mashaney*, 49 Kan. App. 2d at 613-16; see, *e.g.*, *Levine*, 123 F.3d at 582 (7th Cir. 1997); *Wiley v. County of San Diego*, 19 Cal. 4th 532, 966 P. 2d 983, 79 Cal. Rptr. 2d 672 (1998).

The panel majority thus held that a criminal defendant must prove actual innocence in order to successfully bring a legal malpractice claim. 49 Kan. App. 2d at 616.

Judge Atcheson responded to the panel majority with a thorough, well-reasoned, and eloquent dissent, which we summarize and liberally quote as follows.

The dissent begins by observing that justifications offered in early caselaw for the actual innocence rule "have been stated briefly and, for the most part, without much explanation." *Mashaney*, 49 Kan. App. 2d at 623 (Atcheson, J., dissenting). Later

caselaw has built upon that shaky foundation, "unreflectively reiterat[ing]" the proposition that the actual innocence rule is necessary to promote good public policy. 49 Kan. App. 2d at 623 (Atcheson, J., dissenting).

Such an approach, as Judge Atcheson outlines, is no match for the complexities of a case such as this.

"Mashaney's circumstances present two complicating factors. First, the underlying sex crime charged, if true, would be especially repugnant. Though not explicitly stated in the caselaw, the courts adopting an actual innocence rule seem to recoil at the notion a person who may have committed a heinous offense ought to be able to bring a civil action for legal malpractice. But a person's moral culpability for bad acts typically does not otherwise extinguish the legal liability of professionals providing substandard services to that person, even when those acts necessitate the services. Second, after being granted a new criminal trial, Mashaney entered an *Alford* plea to less serious (and less repugnant sounding) felony charges for the same alleged conduct and was adjudged guilty. How to factor that plea into his legal malpractice action with or without an actual innocence rule isn't easy.

"Those complexities are redoubled because the essential legal requirements for criminal defendants to successfully sue their lawyers for malpractice extend beyond this case and must foster fair results in different cases. That is, the rule laid down here will govern the cause of action generally. As the majority suggests, it may be next to impossible to fashion requirements achieving that objective for every permutation. But including actual innocence as a criterion ill serves basic fairness in that persons who have served lengthy prison sentences as a direct result of their lawyers' negligence will be deprived of any tort remedy for that malpractice and some lawyers representing criminal defendants will escape liability when their civil counterparts would not.

"In short, the actual innocence rule detrimentally distorts the law in ways disadvantaging criminal defendants suffering tangible harm because of their lawyers' incompetence, leaving injuries unredressed that the tort system would otherwise compensate. Rejecting that rule would better serve the true public policies embodied in the criminal justice process and in civil tort law. The requirement adopted in *Canaan v. Bartee*, 276 Kan. 116, 131-32, 72 P.3d 911 (2003), that criminal defendants obtain relief under K.S.A. 60-1507 before filing legal malpractice actions—thereby establishing both that their lawyers had provided representation falling below the constitutional standard of adequacy and that they had been materially prejudiced as a result—sufficiently guards the public interest in keeping plainly undeserving litigants from clogging the civil system with frivolous suits." *Mashaney*, 49 Kan. App. 2d at 623-24 (Atcheson, J., dissenting).

Judge Atcheson elaborates on his distortion point:

"The actual innocence rule adds an element to a malpractice claim against a criminal defense lawyer that has no direct counterpart when the claim arises from failed civil litigation. And it materially recasts the 'favorable judgment' standard to substantially disadvantage criminal defendants suing their former lawyers.

"The distorting effects may be better illustrated in an example uncluttered by Mashaney's *Alford* plea. I offer that example as the model for discussing the phony public policy interests cited in favor of an actual innocence rule. I then look at variations on that paradigm, including the circumstances Mashaney presents. Suppose a jury convicts a defendant of robbery for punching the victim and grabbing his or her iPod, and the judge imposes a midrange guidelines sentence of 120 months in prison because the defendant already had two convictions for felony theft. This court affirms the robbery conviction on direct appeal. The Kansas Supreme Court denies the defendant's request for review. The defendant then files a 60-1507 motion collaterally attacking the conviction based on the ineffective assistance of trial counsel. The district court denies the motion, and the defendant appeals. This court finds the lawyer was constitutionally deficient in a way that prejudiced the defendant's right to a fair trial and grants the defendant a new trial. In due course, the Kansas Supreme Court denies the State's petition for review. By that time, the defendant probably has been in prison for more than 60 months or 5 years—a fairly conservative estimate. The defendant again goes to trial on the robbery charge with a different lawyer. The jury finds him not guilty, and he is released from custody. The defendant then sues the lawyer who represented him in the first trial for legal malpractice.

"In that scenario, the criminal defendant enters the legal malpractice action having shown to the satisfaction of the courts in the 60-1507 proceeding that his lawyer breached a constitutional duty of adequate representation and, in so doing, rendered the first criminal trial fundamentally unfair and having secured in the second criminal trial a jury verdict of not guilty. So in the second trial, the criminal defendant arguably received the favorable judgment he should have received in the first trial. Had the criminal defendant been acquitted in the first trial, he would not have spent 5 years in prison. By any reasonable definition, 5 years of wrongful imprisonment looks to be an injury or harm.

"Under the traditional elements of a legal malpractice action, that criminal defendant ought to get a day in court to prove a civil claim for damages against the lawyer representing him in the first trial. Whether the criminal defendant would prevail or not is another matter. The actual innocence rule, however, imposes an extraordinary legal hurdle that would defeat many claims at the pleading stage or on summary judgment and likely would keep many others from being filed at all. Even at trial, the rule would impose a formidable barrier to otherwise meritorious claims. Proving actual innocence is far different from and far more difficult than showing that a criminal defendant would have been found not

guilty—the ultimate 'favorable judgment' in a criminal case. The courts adopting the rule invoke a variety of public policy interests to justify that barrier.

"Although courts are not to examine the wisdom of the policy considerations animating statutes, since that would impermissibly intrude upon the province of the legislature, they should explain themselves when they invoke policy in fashioning common-law rights and duties. Because the actual innocence rule alters a common-law cause of action—a judicially created claim for professional negligence—the courts adopting it in the name of public policy have an obligation to clearly state in a fairly comprehensive manner their reasoning. The failure to do so both abdicates judicial responsibility and obscures the rationale behind the policy, rendering its wisdom suspect." *Mashaney*, 49 Kan. App. 2d at 625-27.

Judge Atcheson then turns to the public policy often identified as furthered by the actual innocence rule and disassembles it. He begins his five-pronged attack with the often-repeated idea that a criminal defendant has no right to an acquittal.

"A panel of the United States Court of Appeals for the Seventh Circuit laid down a cornerstone argument for the actual innocence rule in *Levine*, so I begin there. The panel reasoned that a criminal defendant who is, in fact, guilty has 'no right' to an acquittal in a criminal prosecution and, therefore, can assert no 'legally protected interest' compromised in his or her loss of liberty upon conviction. *Levine*, 123 F.3d at 582. In turn, that defendant cannot base a legal malpractice claim on the incompetence of his or her lawyer, even if that poor representation rendered the trial unfair and the verdict vulnerable on collateral attack. The criminal defendant's resulting incarceration would not be a compensable injury. According to the *Levine* panel, a criminal defendant bringing a legal malpractice claim must prove he or she is factually innocent to establish the incompetent trial lawyer breached a protected duty and caused actionable harm. 123 F.3d at 582-83. The premise is wrong and the reasoning misguided.

"A criminal defendant has a fundamental right to be proven guilty beyond a reasonable doubt grounded in the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution. *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). And if the government fails to meet that burden in a given prosecution, the defendant should go free. The right belongs to anyone charged with a crime—guilty or innocent. See 397 U.S. at 363 ('The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure.'); 397 U.S. at 364 ('[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'). So to say someone who actually has committed a crime

has no right to be found not guilty if the government fails to establish guilt beyond a reasonable doubt is simply incorrect.

"By the same token, criminal defense lawyers owe a duty to their clients to hold the government to its burden of proof and to test the government's case to highlight reasons jurors might doubt the evidence satisfies that constitutional standard. Those lawyers owe a qualitatively indistinguishable performance of that duty to clients they know or suspect are guilty and to clients they know or suspect are innocent. An incompetent performance is no less so because it has been rendered in the service of a defendant who may, in fact, be guilty. In any given case, the lawyer's breach of that duty can result in the conviction and imprisonment of someone who ought to have been acquitted. At least under the standard rules for legal malpractice suits, the client would have an actionable claim against the lawyer for the harm caused by that outcome, including the period of incarceration.

"Incorporating an actual innocence element into criminal malpractice claims doesn't directly alter those principles. The rule simply divides the factually guilty from the actually innocent for purposes of bringing malpractice claims when they are otherwise similarly situated legally—both had a right to an acquittal in the criminal action if the government could not marshal sufficient evidence to convict, and both were owed a duty of competent representation by their lawyers. And both could otherwise seek damages in malpractice actions when the breach of that duty resulted in an unfair criminal trial, an improper conviction, and a loss of liberty.

"Tort law provides a remedy—typically money damages—to Jones when Smith invades a statutory or common-law right of Jones or violates a statutory or common-law duty owed Jones, thereby causing injury to Jones. See *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 269, 261 P.3d 943 (2011). In professional negligence actions, the moral blameworthiness of the injured party seeking relief doesn't bar a claim. Thus, a person shot by police while robbing a bank may bring a medical malpractice action against the surgeon negligently removing the bullet rendering that person a paraplegic. The physician's duty of care isn't legally reduced or extinguished because the patient came to be injured through his or her own fault or criminal wrongdoing.

"But the actual innocence rule injects moral blame into legal malpractice law with odd results. For example, a person gets in a fight outside a bar and hits and seriously injures another patron. The person is prosecuted for intentional aggravated battery, and the victim sues civilly for damages. So the person hires one lawyer to defend him in the criminal prosecution and a second lawyer to handle the civil suit. Each performs horrendously. The civil defense lawyer fails to assert a winning statute of limitations argument based on the 1-year period for bringing battery actions, and the jury returns a judgment in the mid-six figures. See K.S.A. 60-514(b). The criminal defense lawyer doesn't file a motion to suppress his client's highly incriminating statements given to a detective in a custodial interrogation without *Miranda* warnings. When the State can't find the only independent witness to the fight, those statements become the decisive part of the prosecution

case at trial, given the victim's shaky identification. The jury convicts, and the individual receives a 41-month sentence. He loses his direct appeal but has the conviction set aside on habeas review. In the retrial, with [a] new lawyer and without the incriminating statements, he is found not guilty.

"With an actual innocence rule in place, the individual could sue his civil lawyer for malpractice and, in this scenario, likely win, recovering the amount of the judgment entered against him. But he would not have a viable claim against his criminal defense lawyer for damages based on the time he spent in prison. The result is, as I have said, peculiar in creating markedly different malpractice standards for civil practitioners and criminal practitioners. In the example, the client is equally blameworthy in both the civil and criminal cases. Yet, moral blameworthiness (lack of proof of actual innocence) would extinguish the criminal malpractice action but not the civil one. The rule effectively diminishes the potential liability of criminal defense lawyers even though they are duty-bound to protect their clients' liberty interests, something that typically would be viewed as more valuable than the money damages commonly at stake in civil proceedings.

"More peculiarly, perhaps, the rule also divides criminal defense practitioners for malpractice purposes based not on fulfillment of their legal duties but on the culpability of their clients. With an actual innocence rule, a criminal defense lawyer representing a guilty client is essentially granted immunity from civil liability for even the most egregious errors. Critics of the rule point out the illogic of that division, see *Wiley*, 19 Cal. 4th at 547-48 (Mosk, J., dissenting), and at least some proponents of the rule acknowledge it, see *Glenn v. Aiken*, 409 Mass. 699, 705, 569 N.E.2d 783 (1991).

"Some, if not many, actually innocent criminal defendants would be unable to affirmatively prove their innocence by a preponderance of evidence in a malpractice action. They, too, would be deprived of a civil remedy for demonstrable lawyer incompetence leading to legally improper convictions. Similarly, depending on how 'actual innocence' is construed, a criminal defendant convicted of a serious offense would be deprived of a civil remedy even though competent counsel would have effectively marshaled evidence likely producing a conviction for a substantially lesser offense and a significantly shorter period of incarceration. The West Virginia Supreme Court recently held that in a legal malpractice action, the criminal defendant must prove his or her actual innocence not only of the crime charged but any lesser offenses. *Humphries*, 227 W. Va. at 633. For example, a criminal defendant convicted of first-degree murder in Kansas receives a life sentence with no consideration for release for at least 25 years. If, however, a competently presented defense likely would have yielded a conviction for involuntary manslaughter based on a self-defense theory, a defendant with a clean record ought to receive a standard grid sentence of 32 months and would be a border-box candidate for probation. *See State v. O'Rear*, 293 Kan. 892, 901, 270 P.3d 1127 (2012) (unintentional killing resulting from use of excessive force in otherwise lawful act of self-defense constitutes involuntary manslaughter rather than murder); *State v. Pennington*, 43 Kan. App. 2d 446, 461, 227 P.3d 978 (2010).

But that person would have no civil cause of action against the criminal defense lawyer whose incompetence led to his or her incarceration for years during the appellate challenges to the wrongful murder conviction." *Mashaney*, 49 Kan. App. 2d 627-31 (Atcheson, J., dissenting).

Second, Judge Atcheson rejects the assertion that differences between the civil and criminal justice systems support the actual innocence rule.

"Some proponents of the actual innocence rule argue the differences between the civil and criminal justice processes commend the rule. See *Wiley*, 19 Cal. 4th at 541-44. Again, the notion is misguided and gives short shrift to the individualized duty criminal defense lawyers owe their clients.

"The criminal justice system protects broad societal interests in punishing individuals who violate statutory proscriptions against violent and otherwise especially deleterious behavior. The criminal, thus, inflicts an injury on the citizenry as a whole to be redressed with punitive sanctions, often including incarceration. Hence, a criminal case goes forward at the direction of and in the name of the government, and the individual victims directly harmed cannot call off that prosecution. Conversely, the civil justice system largely aims to vindicate individual rights by providing mechanisms to remedy breaches of contractual arrangements and to award compensation for commercial wrongs and physical injuries. Civil law is concerned with compensatory relief, not punishment. Given those differing objectives, the California Supreme Court, for example, has suggested it is simply 'unjust' to allow a factually guilty criminal defendant to bring a malpractice claim against his or her lawyer. *Wiley*, 19 Cal. 4th at 539 ('While a conviction predicated on incompetence may be erroneous, it is not unjust.'). But that confuses the overarching purpose of the criminal courts with the much narrower duty at issue in any legal malpractice claim—the obligation of the lawyer to provide competent representation to his or her client. Ultimately, that obligation is a personal one between lawyer and client, the violation of which historically gives rise to civil liability if the professional incompetence results in harm. As I have said, that personal duty binds a criminal defense lawyer to his or her client regardless of the client's guilt or innocence. Accordingly, tort law ought to afford a remedy for a violation of that particularized duty whether the lawyer's dereliction inflicts an injury in a criminal prosecution or a civil case.

"Advocates for an actual innocence element point out that the civil judicial process simply does not grant new trials to parties incurring bad results because of their lawyers' negligence. Their sole remedy lies in malpractice actions against those lawyers for money damages. But that seems to border on a non sequitur in arguing for an actual innocence requirement. A criminal defendant's right to a new trial based on lawyer incompetence vindicates a societal interest in depriving a person of liberty only if he or she has had a fair trial and, in doing so, protects a constellation of constitutional rights bound up in that process. No similarly

compelling systemic interest attaches to civil proceedings because no similarly compelling interest—liberty—may be lost in an adverse civil judgment.

"They also say that a new trial affords criminal defendants sufficient relief for lawyer malpractice unless those defendants can prove their actual innocence. See *Wiley*, 19 Cal. 4th at 542; *Mahoney v. Shaheen, Cappiello, Stein & Gordon*, 143 N.H. 491, 496, 727 A.2d 996 (1999). But neither the societal interest in punishing only those criminal defendants receiving fair trials nor the availability of a 60-1507 remedy furthering that interest offers full relief for breach of the personal duty a lawyer owes a client—the actual interest directly at issue in a professional negligence case. A complete tort remedy for the violation of a lawyer's duty to a criminal defendant client resulting in an unfair trial and an unwarranted conviction entails compensation for the deprivation of liberty between the conviction and its reversal. The remedy for that harm can only come through a legal malpractice action against the lawyer whose incompetence led to the conviction. The traditional elements for malpractice actions appropriately afford that remedy, since the duty, the breach, and the harm befall the criminal defendant without regard to guilt or actual innocence." *Mashaney*, 49 Kan. App. 2d at 631-32 (Atcheson, J., dissenting).

Third, Judge Atcheson outlines the way in which the actual innocence rule rests upon an erroneous understanding of tort law.

"The advocates for an actual innocence rule invoke 'but for' causation to deprive criminal defendants of any relief in legal malpractice actions. See, *e.g.*, *Wiley*, 19 Cal. 4th at 540. In other words, unless the defendant is truly innocent, the root cause of his or her incarceration is the commission of the criminal act rather than the incompetent lawyering leading to the guilty verdict. The reasoning, however, rests on a rigid application of but for causation inconsistent with general tort law principles. Tort law looks to proximate cause to impose liability so that a later negligent act may supersede earlier wrongful conduct in establishing compensable fault. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420-21, 228 P.3d 1048 (2010). In a tort action, the injured party (here, the convicted criminal defendant) must show that 'but for' the conduct of the party breaching the duty owed (here, the incompetent criminal defense lawyer) the actionable harm (here, the incarceration) would not have occurred. 290 Kan. at 420. That reflects a determination of proximate cause. If the lawyer handling the criminal case fails to demonstrate the State's inability to prove guilt beyond a reasonable doubt when a competent lawyer could have and would have done so, the client has been legally injured by being convicted and imprisoned. That is true whether the client was actually innocent or not. The client's guilt did not bring about or cause the harm, and the harm would have befallen an actually innocent person in the same circumstances. So the client's commission of a crime is not really a direct cause of the legal injury. The other aspect of proximate cause requires that the harm be a foreseeable consequence or result of the negligent conduct. 290 Kan.

at 421. That is a given here. Plainly, a criminal defense lawyer can foresee that a product of his or her incompetent representation may be the conviction of the client despite the State's inadequate evidence.

"As I have already suggested, professional negligence actions typically conform to that model. Skilled professionals are not immunized against the consequences of negligent performance of their duties simply because parties obtain those services as the result of their own negligent conduct or intentional wrongdoing. Tort law carves out no such exception for physicians or lawyers representing clients in civil actions. Creating an exception for criminal defense lawyers with guilty clients seems analytically arbitrary, reflecting not so much a sound application of tort law as a deviation from it to prevent a class of disfavored individuals from pursuing legal malpractice claims.

"The advocates for an actual innocence rule argue that without it, guilty criminal defendants would profit from their own wrongs if they can successfully sue their lawyers for malpractice. *Wiley*, 19 Cal. 4th at 537-38; *Mahoney*, 143 N.H. at 496. The law acknowledges an aphorism that a party should not benefit from his or her own wrongful conduct. And it may be invoked in all sorts of contexts. See *Giles v. California*, 554 U.S. 353, 365-68, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008) (noting maxim in discussing relaxation of rules on admission of out-of-court statements when party has deliberately procured the absence of an adverse witness); *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d 40, 55-56, 847 P.2d 1321 (1993) (noting maxim but declining to apply it to prevent defendant from asserting statute of limitations bar to plaintiff's suit for misuse of trade secrets); *Estate of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011) (relating maxim to equitable estoppel and fraudulent concealment). But jurisprudence resting on generic sayings is distinctly airy, as this argument illustrates.

"A criminal defendant successfully suing his or her lawyer for negligence based on a conviction and the resulting incarceration isn't profiting from his or her underlying crime. He or she is being compensated for a legal injury—a loss of liberty—directly resulting from the lawyer's malpractice in failing to obtain a favorable result for the client in the criminal prosecution. That's not profiting any more than a person injured in a motor vehicle collision 'profits' from a damage award for the harm he or she has suffered. By contrast, Henry Hill quite arguably profited from his crimes to the extent he was paid for assisting in the preparation of 'Wiseguy: Life in a Mafia Family,' a biography about his mob career, and its cinematic dramatization in 'Goodfellas.' See *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991).

"Proponents of the rule contend that private lawyers will not take on paying clients accused of crimes or agree to serve on panels providing representation to indigent criminal defendants without the protection of an actual innocence rule. *Glenn*, 409 Mass. at 707-08; *Mahoney*, 143 N.H. at 496. They say the risk and consequences of malpractice actions from disaffected criminal clients would drive away lawyers. The fear is wholly speculative and entirely unsupported with any

empirical data. If the concern were real, I would expect to see too few lawyers handling criminal cases in those states that treat criminal and civil malpractice actions the same, such as Indiana and Ohio. See *Godby v. Whitehead*, 837 N.E.2d 146, 151 (Ind. App. 2005); *Krahn v. Kinney*, 43 Ohio St. 3d 103, 105, 538 N.E.2d 1058 (1989). But the crisis does not appear to have materialized.

"Moreover, Kansas, among other states, requires that a criminal defendant [be legally exonerated] before even filing a legal malpractice action. *Canaan*, 276 Kan. at 132. The criminal defendant, therefore, must effectively prove to a court that his or her lawyer performed incompetently and that incompetence rendered the criminal case and resulting conviction demonstrably unfair. See *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985). In fiscal 2012, for example, the Kansas district courts granted relief to less than 4 percent of the convicts challenging their convictions through 60-1507 motions. See Annual Report of the Courts of Kansas for Fiscal Year 2012, at 4 (2013). That effectively precludes convicted criminal defendants from pursuing malpractice claims based on insubstantial allegations of incompetent legal representation. A criminal defendant filing a legal malpractice action without having secured relief on a 60-1507 motion would face prompt dismissal on a motion on the pleadings. See K.S.A. 60-212(b)(6), (c). An actual innocence rule, therefore, is unnecessary to combat a doubtful plague of frivolous criminal malpractice actions." *Mashaney*, 49 Kan. App. 2d at 633-35 (Atcheson, J., dissenting).

Fourth, Judge Atcheson persuasively contends that the actual innocence rule would not simplify malpractice litigation.

"Courts favoring an actual innocence element in criminal malpractice actions, notably the California Supreme Court in *Wiley*, suggest those cases would otherwise be exceptionally difficult to adjudicate. Although legal malpractice actions arising out of criminal prosecutions present some challenging litigation issues, as I discuss, an actual innocence rule doesn't directly resolve those challenges for the most part. They persist in any given malpractice action. With an actual innocence rule in place, there simply will be fewer malpractice actions litigated.

"Without an actual innocence element, jurors hearing the malpractice action presumably would first consider whether the criminal defense lawyer's representation fell below the required standard of professional competence. If so, they would then have to decide causation. On that score, the *Wiley* court suggests those jurors essentially would be instructed to determine by a preponderance of the evidence whether but for the lawyer's incompetence the jury in the criminal case would have found the defendant guilty beyond a reasonable doubt. 19 Cal. 4th at 544. The verbiage might vary some in an actual jury instruction, and the operative legal concepts would be explained. But that more or less seems to capture the issue. The *Wiley* court concluded jurors would be utterly flummoxed: 'The mental gymnastics required to reach an intelligent verdict would be difficult to comprehend much less execute.' 19 Cal. 4th at 544. I don't share the California

Supreme Court's dim view of jurors' acuity individually or collectively as a deliberative body. Courts commonly entrust immensely complex issues to jurors, as antitrust or groundwater contamination suits illustrate. See *MTBE Products Liability Litigation*, 725 F.3d 65, 78-80 (2d Cir. 2013) (groundwater contamination); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 824 (3d Cir. 2010) (antitrust); *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 532-34 (6th Cir. 2008) (antitrust).

"The principal complicating factor, according to the *Wiley* court, lies in the differing burdens of proof at play in the malpractice action. 19 Cal. 4th at 544. The malpractice jurors would have to find the controlling facts to be more probably true than not true. One of those facts entails whether the jury in the criminal case would have found guilt beyond a reasonable doubt had the defense lawyering been competent. The same problem arises in civil malpractice cases in which the cause of action allegedly lost in the original suit required proof by clear and convincing evidence, such as a fraud claim or willful or wanton conduct necessary for punitive damages. See *Kelly v. VinZant*, 287 Kan. 509, 515, 197 P.3d 803 (2008) (fraud); K.S.A. 60-3702 (punitive damages).

"Moreover, adding an actual innocence element to criminal malpractice claims would not affect the formulation of the causation issue at all. Actual innocence would impose a gatekeeper element jurors would have to resolve before getting to either breach of the standard of care or causation. Jurors presumably would be instructed that if they found the criminal defendant failed to establish actual innocence, they should return a verdict for the lawyer without addressing any other aspects of the case. If they found the criminal defendant to be actually innocent, they would then have to consider the causation issue—formulated just as it would have been in the absence of an actual innocence element.

"The *Wiley* court also suggested that damages would be difficult to assess in a criminal malpractice action and termed the task 'perplexing.' 19 Cal. 4th at 543. The injury principally entails an extended period of incarceration. A criminal defendant otherwise employable might have lost income, but the primary injury is the loss of liberty and the attendant noneconomic damages. The collective wisdom of 12 jurors would be especially insightful in rendering fair compensation for that sort of loss. See *Domann v. Pence*, 183 Kan. 135, 141, 325 P.2d 321 (1958).

"The *Wiley* court also incorrectly reasoned that civil malpractice actions are much easier to resolve than criminal malpractice actions because the injured parties seek money damages equivalent to the money damages they should have received in the underlying civil suits lost through the lawyers' negligence. But, of course, the harm in the underlying civil suit may well have involved personal injuries, including pain and suffering and other noneconomic damages, that prove no more easily quantifiable than a loss of liberty. The jury rendering a plaintiff's verdict in a malpractice action would have to make some evaluation of the reasonable damages in the underlying case to fashion an award. And juries hearing other tort actions routinely determine monetary damages to compensate for no-

neconomic injuries—not just for direct financial losses. The argument about the difficulty in assessing damages is a phony one. More to the point here, an actual innocence rule wouldn't materially alter the jurors' task in translating a wrongful loss of liberty into a dollar amount reflecting fair compensation." *Mashaney*, 49 Kan. App. 2d at 636-38 (Atcheson, J., dissenting).

Finally, Judge Atcheson argues that the actual innocence rule would fail to achieve its stated purposes.

"Caterwauling aside, the actual innocence rule neither advances substantial public policy objectives rooted in legal doctrine nor facilitates the resolution of malpractice claims against criminal defense lawyers based on the existing tort law. Rather, it simply reflects a value judgment that a group of criminal defendants— those who may have committed offenses—should be deprived of a civil remedy against their lawyers when a given lawyer's abysmal performance resulted in a given defendant's conviction and incarceration. As I have outlined, criminal defendants regardless of guilt or innocence have a right to competent legal representation. Lawyers have a correlative duty to provide that level of representation to their clients. And the judicial process should afford those clients, regardless of guilt or innocence, the opportunity for full recompense if a violation of that right and duty results in their conviction and incarceration. The actual innocence rule denies one segment of the community of criminal defendants a remedy afforded the rest of that community essentially based on a characteristic unconnected to the right being vindicated." *Mashaney*, 49 Kan. App. 2d at 638 (Atcheson, J., dissenting).

We agree with the above-summarized and quoted portions of Judge Atcheson's dissent; we reject the actual innocence rule in Kansas. We also agree with him that the Sixth Amendment-based ineffective assistance of counsel standard a criminal defendant must meet to surpass the exoneration threshold for accrual of a legal malpractice action "probably forgives more bad lawyering than the professional negligence standard governing malpractice actions." 49 Kan. App. 2d at 639 (Atcheson, J., dissenting). But that is neither here nor there in Mashaney's case. The fact is that he did meet the exoneration threshold on April 11, 2011. His malpractice action accrued on that date, and he timely filed it within the 2-year statute of limitations. His later *Alford* plea to other charges did not automatically bar his lawsuit under the actual innocence rule.

As Judge Atcheson alludes to still later in his dissent, Mashaney's plea, the factual predicate for it, the time he served on the original

convictions versus the sentence imposed after the plea, and other factors may pose proof challenges for him on the traditional elements of the tort of legal malpractice. But any strength or weakness of that type was not amenable to decision as a matter of law on the motions filed by Sweet-McKinnon and Girard-Brady. On the record before us today, we must reverse the panel majority's and the district judge's decisions to dismiss Mashaney's claims against the individual defendants and remand them to the district court for further proceedings.

One final note bears mention: A Court of Appeals judge writing in dissent enjoys more freedom than this court to discuss what, in his view, should happen as a matter of law in a given case if his position were to win a majority and a desired remand granted. We are not so free. See *State v. Soto*, 299 Kan. 102, 129, 322 P.3d 334 (2014) (declining to issue advisory opinion on issue not yet ripe; noting Kansas appellate courts generally do not render advisory opinions). Thus we deliberately do not engage in such further discussion here, awaiting a future case in which such questions arise on an adequate record.

## CONCLUSION

Defendant Board of Indigents' Defense Services is not subject to suit in a legal malpractice action, and the decision of the district court judge dismissing it from this case is affirmed. The Court of Appeals decision affirming the district court on that point is affirmed. The district court judge's decision dismissing the individual defendants, Sarah E. Sweet-McKinnon and Virginia A. Girard-Brady, is reversed, and the Court of Appeals panel majority's decision affirming that dismissal is reversed. Kansas does not require a legal malpractice plaintiff who bases his or her claim on ineffective assistance of counsel in a criminal case to prove actual innocence of the charged crimes. This case is remanded to the district court for further proceedings.

\* \* \*

STEGALL, J., concurring: I join and concur fully with today's holding as set forth in the four syllabus paragraphs. I write separately to make clear what we have *not* decided. Specifically, today's

decision does not decide what role a criminal defendant's actual guilt might play in a subsequent civil legal malpractice lawsuit. Our full-throated approval of Judge Atcheson's dissenting opinion—an approval I cannot echo—could leave the impression that we have adopted his view that in these cases the criminal defendant's "guilt did not bring about or cause the harm." *Mashaney v. Board of Indigents' Defense Services*, 49 Kan. App. 2d 596, 633, 313 P.3d 64 (2013) (Atcheson J., dissenting). We have not.

Actual guilt (as opposed to actual innocence) should remain a relevant evidentiary inquiry as a jury considers the two elements of proximate causation. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010) (Proximate cause is a cause that "in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act."). Actual guilt may be relevant to both (1) cause in fact and (2) legal causation. For example, the jury may decide that even had the defense attorney not been professionally negligent the criminal defendant would still have been convicted due to his actual guilt. Or, the jury may decide that the criminal defendant's actual guilt is the causal headwaters from which his injury most naturally and foreseeably flowed. As such, his actual guilt stands between the injury and the professional negligence to cut off legal malpractice liability. In this way, actual guilt can be an intervening and superseding cause.

In our causation jurisprudence, an intervening cause is almost always described as one that occurs subsequent *in time* to the alleged negligent or wrongful act. For example, we have said an

"intervening cause is one that actively operates to produce harm to another party *after the actor has committed a negligent act or omission*. An intervening cause absolves a defendant of liability only if it supersedes the defendant's negligence, that is to say, the intervening cause breaks the connection between the initial negligent act and the resulting harm." (Emphasis added.) *Wrinkle v. Norman*, 297 Kan. 420, 429, 301 P.3d 312 (2013) (Rosen, J., concurring in part and dissenting in part).

See also *Puckett*, 290 Kan. at 421 ("An intervening cause is 'one which actively operates in producing harm to another after the

actor's negligent act or omission has been committed.' Restatement [Second] of Torts § 441 [1964].").

Most assuredly, this chronological sequence is almost always present in cases involving intervening causes, but it need not be. And our description of intervening causes as necessarily coming *after* the alleged negligent or wrongful act leads to a common misunderstanding. An intervening cause is not "intervening" because it occurs somewhere along a historical continuum between the alleged negligence and the harm, but rather because it *legally* stands between the alleged negligence and the harm—thus becoming a superseding cause.

Our seminal case on this point may be *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998). In *Chastain*, the criminal defendant argued that the victim decedent's act of running a stop sign—*before* being struck and killed by a vehicle driven by an intoxicated Chastain—was the intervening and superseding cause of his death thus cutting off Chastain's criminal liability. In approving a jury instruction to this effect, we held:

"While contributory negligence is no defense in a prosecution for a driving offense of involuntary manslaughter or vehicular homicide, it is a circumstance to be considered along with all other evidence to determine whether the defendant's conduct was or was not the proximate cause of a decedent's death. In some instances, a decedent's contributory negligence may have been a substantial factor in his or her death and a superseding cause thereof; it may have intervened between a defendant's conduct and the fatal result so as to be itself the proximate cause." 265 Kan. 16, Syl. ¶ 7.

See also *State v. Brammer*, 301 Kan. 333, 342-43, 343 P.3d 75 (2015) (in an involuntary manslaughter while driving under the influence prosecution, a defendant may be entitled to an intervening cause instruction if the defendant argues and produces evidence that the victim's failure to wear a seat belt caused her death).

In this sense, actual guilt—which if present in these cases will *always* have occurred prior in time to the alleged legal malpractice—is akin to other legal doctrines of causation and liability such as comparative fault and assumption of risk. All of these doctrines ask

"how plaintiffs might be responsible for their own injuries. Guilt-in-fact has the same focus. In other words, if plaintiffs actually engaged in criminal conduct, then they are partially responsible (and more culpable) for their own resulting injuries (such as incarceration). Under these circumstances, the plaintiff's own conduct precludes his or her recovery, just as with other conventional defenses." *Shaw v. State, Dept. of Admin.*, 861 P.2d 566, 572 n.9 (Alaska 1993).

Whether Kansas will permit actual guilt to be pled and proved as a true affirmative defense or will simply require the traditional proximate causation element in the criminal defendant's subsequent malpractice case—thereby permitting a legal malpractice defendant to argue to the jury that the criminal defendant's actual guilt is an intervening and superseding cause of his injury—remains to be seen. See, *e.g.*, *Shaw*, 861 P.2d at 572 ("Rather than require the plaintiff to prove his actual innocence . . . the defendant may raise the issue of the plaintiff's actual guilt as an affirmative defense. The attorney . . . as the party raising the affirmative defense, will thus have the burden of proof by a preponderance of the evidence as to the actual guilt of the plaintiff."); *Desetti v. Chester*, 772 S.E.2d 907, 910 (Va. 2015) ("a legal malpractice plaintiff who alleges that malpractice occurred during the course of a criminal matter must plead facts establishing this element of the cause of action: that the damages to be recovered were proximately caused by the attorney's negligence but were not proximately caused by the legal malpractice plaintiff's own criminal actions").

Resolving these questions must wait for another case on another day.