

# In the
# Missouri Court of Appeals
## Western District

DAY ADVERTISING, INC., ET AL,

        **Appellants,**

v.

PAUL HASTY JR, ET AL.,

        **Respondents.**

**WD83379**

**OPINION FILED:**

**JULY 21, 2020**

---

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable John M. Torrence, Judge**

**Before Division Two: Karen King Mitchell, Chief Judge, Presiding,**
**Anthony Rex Gabbert, Judge, W. Douglas Thomson, Judge**

Day Advertising, Inc., Heartland Title Services, Inc., and James C. Day ("Appellants" collectively)[1] appeal the circuit court's grant of summary judgment to Paul Hasty, Jr. and Hasty and Associates, LLC ("Respondents" collectively) on Appellants' September 5, 2018, Petition alleging legal malpractice against Respondents. Appellants assert six points on appeal claiming the circuit court, 1) erred in granting summary judgment on the claim regarding Day Advertising, Inc. ("Day Advertising"), arguing the circuit court improperly based its ruling on an argument not

---

[1] Not all Appellants were named in all claims within Appellants' Petition. "Appellants" will also be used to collectively reference Appellants named in individual claims after the specific individual Appellants named in those claims have been identified.

raised by Respondents, 2) erred in granting summary judgment on the claim regarding Day Advertising, because genuine issues of material fact existed as to whether Eric Johnson damaged Day Advertising, 3) erred in granting summary judgment on the claim regarding Heartland Title Services, Inc. ("Heartland"), because genuine issues of material fact existed as to whether the claim was timely filed, 4) erred in granting summary judgment on the individual claims of James Day, arguing Day had cognizable claims with allegations of compensable damage against Respondents, 5) erred in granting summary judgment on Appellants' claim of fraudulent misrepresentation, arguing genuine issues of material fact existed that precluded judgment as a matter of law, and 6) erred in severing Appellants' claims for trial after dismissing Day's individual claims, arguing the claims were not misjoined and arose from the same series of transactions or occurrences. We affirm.

## Factual and Procedural Background[2]

The claims involving Day Advertising, alleged in Counts I and III of Appellants' Petition, arise from Respondents' alleged mishandling of a legal malpractice lawsuit Day Advertising had against attorney, Arthur Benson, II, who allegedly mishandled a separate legal malpractice suit against F. Coulter DeVries, Daniel Jones, and DeVries and Associates for their alleged mishandling of a breach of employment contract dispute involving former Day Advertising employee, Eric Johnson. In 2003, this court discussed the underlying facts as follows in *Day v. DeVries and Associates*, 98 S.W.3d 92 (Mo. App. 2003).[3]

---

[2] Additional facts will be discussed, as relevant, under each point relied on.

[3] In *Day v. DeVries and Associates* we addressed whether Appellant Day's and Appellant Day Advertising's claims against F.Coulter DeVries, Daniel Jones, and DeVries and Associates were time-barred. We determined they were not. That case proceeded to trial and in *Day Advertising Inc. v. Devries and Associates, P.C.*, 217 S.W.3d 362 (Mo. App. 2007), we affirmed the trial court's judgment, entered on a jury verdict, which awarded no damages to Day Advertising. In the appeal before us, neither party references these cases.

In September 1998, Day and Day Advertising hired F. Coulter DeVries, Daniel Jones, and DeVries and Associates to represent them in litigation against Eric Johnson to enforce a covenant not to compete against Johnson and to take action against Johnson for his alleged default on a loan. *Id.* at 93. Day produced a "copy" of a promissory note which Jones attached to the petition, and also used to obtain an *ex parte* order authorizing the seizure of Eric Johnson's automobile. *Id.* After Johnson obtained his own *ex parte* order to search Day's and Day Advertising's computer files, DeVries and Jones learned that the note submitted to the court was not a copy of the original, but was a new document created by Day shortly before the replevin action was filed. *Id.* On October 14, 1998, DeVries and Jones asked Day to sign a statement explaining that, although Day told Jones the document was a copy of an original, the document was actually drafted by Day based on his recollection of the original document. *Id.* at 93-94. Further, that Jones was not apprised of this when Day presented the document to Jones, and was instead advised of this on October 12, 1998. *Id.*

DeVries and Jones advised Day they were withdrawing as his counsel, but DeVries agreed to determine whether a settlement could be negotiated with Johnson. *Id.* at 94. Day ultimately signed an agreement that all litigation against Johnson would be dismissed with prejudice, Day would forfeit a $10,000 replevin bond to Johnson, return Johnson's auto and assume all costs associated with its seizure, pay Johnson his final wages, withdraw any opposition to Johnson's claims for unemployment compensation, and cancel Johnson's employment contract, including the covenant not to compete. In the midst of the negotiations, however, Day consulted another attorney because he was concerned DeVries was no longer acting in his best interest and that Day was being asked to capitulate to Johnson as a result of what he perceived as DeVries and Jones' mishandling of the case. *Id.*

On April 27, 1999, Day and Day Advertising filed a malpractice suit against DeVries, Jones, and DeVries and Associates in Kansas state court. *Id.* After their attorney withdrew, the plaintiffs did not obtain replacement counsel or appear at a scheduled hearing, and the court dismissed the case without prejudice July 25, 2000. *Id.* Day and Day Advertising then hired Arthur Benson of Benson & Associates to pursue the malpractice action, which was filed December 18, 2000, in Missouri state court. *Id.* The plaintiffs alleged they had "suffered damages in excess of $900,000 from, among other things, lost business." The trial court granted summary judgment to the defendants on statute of limitations grounds. *Id.* This court reversed, finding that the claim accrued in Missouri, rather than Kansas, and was therefore timely filed. *Id.* at 96.

The case proceeded to an eight-day jury trial. *Day Advertising Inc. v. Devries and Associates, P.C.*, 217 S.W.3d 362 (Mo. App. 2007). (The "Jury Trial Minutes and Judgment" show that James Day voluntarily dismissed his individual claims prior to trial.) Day Advertising claimed at trial that, but for the Defendants' alleged negligence, Day Advertising would have recovered liquidated damages in the underlying contract action against Johnson. *Id.* at 367. The defendants presented evidence to show that there was inadequate consideration for the employment contract and that the liquidated damages clause was unenforceable. *Id.* The jury returned a verdict assessing 10% fault to DeVries, 5% fault to Jones, and 85% fault to Day Advertising. *Id.* at 365. Despite having found fault on the part of DeVries and Jones, the jury awarded no damages to Day Advertising. *Id.* There were no objections to the verdict at that time, and the court entered a judgment consistent with the verdict. *Id.*

Day Advertising appealed the judgment. On review, we discussed that Day Advertising had the burden in its legal malpractice suit to show that the defendants' negligence proximately resulted in damages. *Id.* at 367. Also, because the alleged damages were based on the resolution

4

of an underlying action, Day Advertising had to prove a case within a case. *Id.* Further, because the legal malpractice claim was brought after the underlying action was settled, Day Advertising had to prove the settlement was necessary to mitigate damages, or that Day Advertising was driven to the necessity of settling because the plaintiff would have been worse off had the case not settled. *Id.*

Following this Opinion, Appellants Day and Day Advertising then claimed that Benson's negligence in the case against DeVries, Jones, and DeVries and Associates yielded an unfavorable result, prompting them to hire Respondents to sue Benson for malpractice. Appellants claimed that, as a result of Respondents' negligence, Appellants suffered damages which included "the adverse result in the earlier case and attendant loss of compensation for the damages at issue in that case, and the expenditure of legal fees to defendants in connection with their representation of Plaintiffs Day and Day Advertising in their earlier case, and general damages."

Appellants' Petition alleged the following: 1) Respondents damaged Appellants Day and Day Advertising by negligently mishandling a legal malpractice claim against Arthur Benson, II and Benson & Associates; 2) Respondent Hasty made fraudulent misrepresentations regarding the services he would provide Appellants Day and Day Advertising and Appellants relied on those representations to their detriment, and; 3) Respondents damaged Appellants Day and Heartland by negligently mishandling an adversarial bankruptcy matter involving a former executive of Heartland, *f/k/a* Heartland Title Company, Inc. With regard to Appellant Day's individual claims, the Petition alleged Day suffered the same injuries as the corporate appellants. Additionally, Day alleged he suffered damages from having to pay for attorney fees himself, having to use his own money to finance Heartland's expenses, and suffered general damages in the form of mental and emotional distress.

5

The trial court dismissed Day's individual claims as it found he had no valid individual claims against Respondents. The court then severed the Day Advertising and Heartland claims for trial under Rules 52.05 and 52.06.

Following the trial court's dismissal of Day's individual claims, Respondents moved for summary judgment on the remaining claims against the corporate parties. Respondents argued they were entitled to summary judgment on the Day Advertising claim because, after the close of discovery, Appellants could not present sufficient evidence from which a jury could find Appellants met their burden to establish the cause of Day Advertising's complete destruction, or the amount of Day Advertising's alleged damages. Respondents argued they were entitled to summary judgment on the Heartland claim because it was barred by the statute of limitations. Further, that Appellants failed to present sufficient evidence of the cause of Heartland's destruction or its alleged damages. Finally, Respondents argued they were entitled to summary judgment on the fraudulent misrepresentation claim because Appellants failed to present evidence from which a jury could reasonably conclude Respondents had an intent to defraud Appellants at the time of hiring, or that Appellants suffered any damages as a result thereof.

On August 28, 2018, the trial court granted summary judgment to Respondents on all of Appellants' claims. Finding no genuine issue of material fact in dispute, the court concluded the following:

1. With regard to Plaintiff Day Advertising Inc.'s claim under Count I, Plaintiff has presented neither credible nor admissible evidence that Eric Johnson caused damages to Plaintiff. Moreover, Plaintiff's claim for attorney fees paid to Defendant is not recoverable on a claim for legal malpractice.

2. Plaintiff Heartland Title Services, Inc.'s claim under Count II is clearly barred by the statute of limitations.

3. Plaintiff Day Advertising Inc. has not presented any admissible evidence on Count III which would prove a present fraudulent intent on the part of Defendants at the time Day Advertising Inc. engaged the services of Defendants to represent Day Advertising, Inc.

Appellants moved for a new trial on September 27, 2018, which was denied by the court on November 22, 2019. This appeal follows.

**Standard of Review**

The standard of review for an appeal challenging the grant of a motion for summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Accordingly, we do not defer to the trial court's decision, but instead use the same criteria that the trial court should have employed in initially deciding whether to grant Respondent's motion. *Barekman v. City of Republic*, 232 S.W.3d 675, 677 (Mo. App. 2007) (internal citations omitted). We review the record in the light most favorable to the party against whom judgment was entered and accord that party the benefit of all inferences which may reasonably be drawn from the record. *Id.* Summary judgment is appropriate where the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.*

> A defending party may establish a right to summary judgment by showing: (1) facts negating any one of the claimant's elements; (2) that the party opposing the motion has presented insufficient evidence to allow the finding of the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support a properly pleaded affirmative defense.

*Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W.3d 50, 58-59 (Mo. banc 2005).

7

**Point I – Summary Judgment on Issue Allegedly not Raised in Day Advertising**
**Claim**
**(Appellants Day and Day Advertising)**

Appellants contend in their first point on appeal that the circuit court erred in granting summary judgment on the claim regarding Day Advertising because the circuit court improperly based its ruling on an argument not set forth as a basis for summary judgment. Appellants argue that the trial court granted Respondents' motion for summary judgment "based on the trial court's *sua sponte* conclusion that there was no evidence that Eric Johnson caused damage to Day Advertising, Inc.," but Respondents never claimed or alleged there was no such evidence and did not base their motion on that ground.

Appellant Day operated Appellant Day Advertising, a company that sold advertising in the yellow page telephone books. In an underlying lawsuit, Appellants contended that a former employee, Eric Johnson, caused the destruction of Day Advertising when Johnson improperly took clients/accounts away from Day Advertising. Appellants contended that Day Advertising was unable to sustain the loss of those customers due to the nature of the yellow pages advertising business and the company's debt structure, lost over $1 million in business due to Johnson's actions, and had to cease operations.

As discussed above, Appellants hired attorneys F. Coulter DeVries, Daniel Jones, and the firm of DeVries and Associates to handle breach of employment contract and breach of loan agreement claims against Johnson. Appellants claim that the attorneys' negligence in that matter allowed Johnson to take the accounts and cause damage to Appellants.

Appellants hired Arthur Benson to pursue a claim of malpractice against DeVries, Jones, and DeVries & Associates. Appellants then claimed that Benson's negligence in that case resulted in an unfavorable result, prompting them to hire Respondents to sue Benson for malpractice.

8

In the case which resulted in this appeal, Appellants sued Respondents for their alleged malpractice in the case against Benson. Appellants claimed that, as a result of Respondents' negligence, Appellants suffered damages which included "the adverse result in the earlier case and attendant loss of compensation for the damages at issue in that case, and the expenditure of legal fees to defendants in connection with their representation of Plaintiffs Day and Day Advertising in their earlier case, and general damages."

Respondents' moved for summary judgment on Appellants' claims regarding Respondents' handling of the Benson malpractice suit. Respondents argued that, 1) discovery had closed and Plaintiffs had not presented, and could not present, any admissible evidence from which a jury could reasonably determine the cause of the destruction of Day Advertising as a going concern, for which damages were sought, 2) Plaintiffs had not presented, and could not present, any admissible evidence from which a jury could reasonably determine the amount of damages for the alleged destruction of Day Advertising as a going concern, 3) the uncontroverted facts show that Plaintiffs had already been fully compensated for the damages they were claiming due to a $1 million settlement Plaintiff's received in prior litigation for the alleged destruction of Day Advertising, 4) damages for prejudgment interest were not recoverable under Missouri law because the damages on which Plaintiffs sought prejudgment interest were not liquidated and Plaintiffs had not made a qualifying demand as required by the Missouri statute for prejudgment interest damages, 5) Plaintiffs had not presented, and could not present, any admissible evidence from which a jury could reasonably determine the amount of attorney's fees Plaintiff's paid Respondents for handling the lawsuit at issue, and 6) Plaintiff Day was not entitled to "general damages" because he had not alleged or presented evidence of a medically diagnosable or medically significant mental injury.

9

In response, Appellants Day and Day Advertising, among other things, claimed they had evidence of the cause of Day Advertising's destruction through the testimony of Plaintiff James Day. Appellants argued that, "Plaintiff Day testified that the actions of Eric Johnson, which underlie this lawsuit, caused the destruction of the business." Day and Day Advertising also claimed that they could prove payment of attorneys' fees to Respondents because "James Day received and paid defendants' invoice for their handling of the McGuire Matter."

The court granted summary judgment on Count I stating that, "[w]ith regard to Plaintiff Day Advertising Inc.'s claim under Count I, Plaintiff has presented neither credible nor admissible evidence that Eric Johnson caused damages to Plaintiff. Moreover, Plaintiff's claim for attorney fees paid to Defendant is not recoverable on a claim for legal malpractice."

In their first point on appeal, Appellants do not claim that admissible evidence exists to support that Johnson caused the destruction of Day Advertising and, thus, the court erred for reaching this conclusion on those grounds; Appellants sole claim in their first point on appeal is that the court should have never reached this conclusion because, "Respondents never argued, claimed, or asserted in the motion for summary judgment that there was no evidence that Johnson caused any damage to Appellants."

The record shows that, while not naming Johnson specifically, Respondents alleged in their motion for summary judgment that, Appellants had not presented, and could not present, any admissible evidence of the cause of the destruction of Day Advertising. Appellants then responded that, Plaintiff James Day's testimony was their evidence for this claim and the testimony showed that Eric Johnson caused the destruction of Day Advertising.

We find that, the issue of whether evidence existed that Eric Johnson caused damage to Appellants was clearly before the court as it was raised by Appellants in response to Respondents' motion.

Point I is denied.

### Point II - Material Facts Allegedly in Dispute in Day Advertising Claim
### (Appellants Day and Day Advertising)

In their second point on appeal, Appellants contend the circuit court erred in granting summary judgment on the claim regarding Day Advertising, arguing that genuine issues of material fact existed as to whether Eric Johnson damaged Day Advertising. Appellants contend that Appellant James Day testified that, Appellants lost over $1 million in business due to Johnson's actions and had to cease operations because Day Advertising could not continue as a viable company after losing accounts to Johnson. Further, that Day testified that, losing those accounts "destroyed" Day Advertising. Appellants contend that Day's testimony was sufficient to demonstrate that a genuine issue of material fact existed regarding this issue.

In arguing for summary judgment, Respondents contended that Day Advertising could have only been destroyed or driven out of business once, and a prior sworn admission by Day was that Day Advertising was driven out of business by Southwestern Bell Yellow Pages, Inc. Respondents also argued that the issue of whether Eric Johnson destroyed the business would require expert testimony and that Plaintiffs had not designated an expert to offer such an opinion as to the cause of the alleged destruction. As to the separate issue of damages, Plaintiffs designated Dr. Kelsey as a damages expert. Dr. Kelsey specifically stated that he could not offer an opinion as to what destroyed Day Advertising.

11

In response, Appellants argued that Respondents had not proven that expert testimony was required but, if it was, Appellants had designated Plaintiff Day as an expert on the telephone book advertising industry, and he was qualified to testify as to the cause of Day Advertising, Inc.'s destruction as a business.

The evidence Appellants alleged supported this claim includes various deposition testimony by Day:

1)
Q: Okay. Now, when you say that Day Advertising ceased in July of '99, I mean, is there a definitive date where you closed up shop, you laid people off? What took place there?

DAY: I think it was the first of July, best of my recollection. It's been quite a while.

Q: Fair enough. Is there a particular reason why it ceased in July of '99?

DAY: Due to an employee, I lost a million dollars' worth of business, and I had to make a business decision while I had income coming in to pay off banks and shut it down. If I kept going and I didn't increase the business dramatically, I would have gotten myself in a real bind.

2)
Q: Without these nine accounts – you know what I'm talking about when I say these nine accounts? I know we don't know who they are, but do you know what I'm talking about?

DAY: Southwestern Bell.

Q: Without these nine accounts was Day Advertising able to conduct business at all?

DAY: Are you talking about after Johnson took them?

Q: If you don't have those nine accounts, was Day Advertising out of business?

DAY: I couldn't support the debt structure unless I made those accounts up immediately, and to do that in a short period of time was tough enough, but I felt strong that Southwestern Bell would go back to their own tactics which would prevent me from growing, which they did before.

12

Q: Okay. So essentially, losing those nine accounts destroyed your business, Day Advertising?

DAY: It did. If I would have stayed in business and wouldn't have been able to make up that million dollars in a short period of time and I didn't think I could, it's hard to do anyway, but with Southwestern Bell I'd get down to here and money would come back in and I'd be upside down, wouldn't be able to repay the banks, wouldn't be able to do anything so I made a decision to close it out.

Q: I think you also said that if you were going to replace those nine accounts you were fearful that Southwestern Bell would interfere with that?

DAY: I was because they had for seven years prior to that.

Q: Was it your claim in that Southwestern Bell case that Southwestern Bell ruined your business?

DAY: No. They just damaged those nine accounts.

…

Q: Okay. It was also your allegation that Day Advertising was damaged by Eric Johnson taking those nine accounts as well?

DAY: Well, it obviously was, yes.

Q: Okay. Did Eric Johnson taking those nine accounts, was it your allegation that ruined Day Advertising?

DAY: It put me in a position where I couldn't handle the debt structure unless I replaced them immediately.

Q: If Southwestern Bell wasn't interfering to the extent that you alleged, did you have any confidence you would be able to replace those accounts?

DAY: It was a tough business. You know, I was good at it. I started from nothing. The only ones that I didn't get were those nine. So, you know, I was good at it, but it's a tough business. And it was – Southwestern Bell was reducing commissions and making it more expensive to do business with the technology they demanded. So it was a case of diminishing returns.

3)
Q: Okay. So at least we talked about so far is Southwestern Bell harmed the business of Day Advertising; is that fair?

DAY: That's why they settled, yeah.

Q:     Eric Johnson, you believe, affected the business or harmed the business of Day Advertising?

DAY:  Well, he took a million dollars' worth of stuff.

Q:     Do you know if he was ever successful with those nine accounts or not?

DAY:  He was in business for a period of time. I don't know how successful he was.

Q:     How long was he in business?

DAY:  I don't know.

Q:     What did he call his company?

DAY:  I believe it was Sunflower.

Q.     Okay. You also claim that DeVries and Jones harmed the business of Day Advertising?

DAY:  Yes.

Q:     Benson harmed the business of Day Advertising?

DAY:  Well, Benson didn't do his job which would have resulted in a favorable judgment in my opinion.

Q:     Okay, you also claimed that Hasty harmed Day Advertising?

DAY:  That's right. The same.

Respondents' Statement of Material Fact #23 states that Plaintiff James Day did not personally know the true nature and scope of damages that Day Advertising suffered because of Southwestern Bell Yellow Pages. Respondents cited to deposition testimony wherein Day was asked, "My question for you is what do you believe is the true nature and scope of the damages that Day Advertising had sustained?" Day responded, "The only source I have is information from the expert witnesses as to what they perceived it to be." In answer to Respondents' Fact #23,

14

Appellants indicated that Day relied on experts to determine the true nature and scope of the damages sustained and that Day believed the destruction of Day Advertising caused the company to sustain a loss in excess of $1 million.

In answer to Respondents' Statement of Material Fact #10, Appellants admitted that Day Advertising could only be destroyed or driven out of business once. Appellants also admitted in response to Respondents' Statement of Material Fact #16 that Day Advertising received $1 million in settlement of its claims against Southwestern Bell Yellow Pages, Inc.

The circuit court concluded that Respondents were entitled to summary judgment on Appellants' claim that Respondents harmed Appellants by mishandling a claim against Benson (who allegedly mishandled a claim against other attorneys, who allegedly mishandled the claim against Johnson) because "Plaintiff has presented neither credible nor admissible evidence that Eric Johnson caused damages to Plaintiff."

We agree that the deposition testimony relied on by Appellants was insufficient for a reasonable juror to ascertain what damages to Day Advertising, if any, might have been caused by Johnson. Appellants alleged that Day's testimony supported that Eric Johnson "destroyed" Day Advertising by taking nine accounts worth $1 million. The testimony cited by Appellants does not support this claim, however, because Appellants admitted that the business could only be destroyed once and Appellant Day testified that Southwestern Bell damaged those same nine accounts with Day making the decision to close the business because any attempt to replace those accounts to salvage the business would have been thwarted by Southwestern Bell. Although Day stated that he did not claim in the Southwestern Bell case that Southwestern Bell *destroyed* his business -- that his contention was only that Southwestern Bell damaged those nine accounts -- this averment is contradicted by Day's testimony that Southwestern Bell not only damaged the

15

nine accounts but also prevented any recovery from that loss which led to him closing the business.[4]

Moreover, while the testimony by Day, cited by Appellants, claims that, both Johnson's actions and Southwestern Bell's actions resulted in the loss of the same nine accounts which destroyed the business, this same testimony suggests that Day could have potentially replaced those accounts and saved the business but for Southwestern Bell's predicted actions. Significantly, although Day testified he believed Johnson's actions resulted in $1 million in damages, he had previously testified that he had to rely on experts to assess Southwestern Bell's damage to the nine accounts. He provides no explanation for how experts were necessary to explain Southwestern Bell's damage to the same accounts allegedly damaged by Johnson, but his own beliefs as to the damage to those accounts caused by Johnson is sufficient evidentiary support to withstand summary judgment. "Conclusory allegations are not sufficient to raise a question of fact in summary judgment proceedings. Additionally, mere speculation does not create a genuine issue of material fact; rather, the record must demonstrate factual questions that would permit a reasonable jury to return a verdict for the non-moving party." *Midwest Coal, LLC ex rel. Stanton v. Cabanas*, 378 S.W.3d 367, 374 (Mo. App. 2012) (internal citations and quotation marks omitted). Other than Day's conclusory allegation that Johnson destroyed the business by taking the same nine accounts Southwestern Bell damaged, and that the damages caused by Johnson

---

[4] While we agree with Appellants that multiple tortfeasors can contribute to damages, we disagree with Appellants' contention that the $1 million settlement received from Southwestern Bell is completely irrelevant on the facts of this case where Day testified that Southwestern Bell "just damaged those nine accounts," Appellants received $1 million for that damage, and now ask for $1 million from Johnson for allegedly taking those same nine accounts. Where Appellants allege that both Southwestern Bell and Johnson caused damage to the same nine accounts that were worth $1 million, and it is undisputed that Day Advertising received $1 million in settlement from Southwestern Bell, nothing in the record supports that Appellants would be entitled to an additional damage award from Johnson.

16

amounted to $1 million, there is no evidentiary support in the record for any damages actually caused by Johnson or the value of that damage.

The circuit court did not err in granting summary judgment on the claim regarding Day Advertising in that Appellants presented insufficient evidence from which a reasonable juror could determine what damages, if any, Eric Johnson caused Day Advertising.

Point II is denied.

## Point III – Statute of Limitations in Heartland Claim
### (Appellants Day and Heartland)

In their third point on appeal, Appellants contend the circuit court erred in granting summary judgment on their claim regarding Heartland, arguing the facts in evidence showed the claim was timely under both the Discovery Rule and the Continuous Representation Rule. Appellants claim there was a genuine dispute as to material facts regarding whether Appellants knew that the McGuire bankruptcy matter was dismissed as a result of Respondents' negligence.

Respondents were retained to represent Appellant Heartland in an adversarial proceeding Heartland initiated in the bankruptcy case of Deborah McGuire, a former Heartland executive, in the United States Bankruptcy Court for the District of Kansas. Heartland's previous counsel filed the adversarial proceeding September 11, 2007. Respondents filed an entry of appearance on behalf of Heartland in January of 2008. On May 21, 2008, McGuire filed a Motion to Dismiss Plaintiffs' Adversary Proceeding based upon a claim of insufficient service of process. In July 2008, the Bankruptcy Court granted McGuire's Motion to Dismiss after Heartland filed no opposition to the Motion. In December 2008, Respondents filed a Motion to set aside the dismissal, which the Bankruptcy Court denied in February 2009. The Bankruptcy Court indicated in its order denying the motion that its decision was based on Heartland's failure to address its

17

delay in responding to the dismissal motion and delay in seeking to set the dismissal aside. Respondents advised Appellants of the dismissal and denial of the motion to set aside the dismissal by February 25, 2009, further advising that Appellants had no further recourse against McGuire.

On May 28, 2009, Appellants picked up from Respondents' office a complete copy of the McGuire file, including the Bankruptcy Court's order denying Heartland's motion to set aside the dismissal. Appellants filed their legal malpractice claim against Respondents approximately six years later on March 4, 2015.

The parties agreed that the Kansas statute of limitations applied to the Heartland claim. The statute of limitations set forth in KSA 60-513 bars legal malpractice claims not brought within two years of accrual.

The circuit court granted summary judgment to Respondents on Appellants' claims against Respondents related to the McGuire matter stating, "Plaintiff Heartland Title Services, Inc.'s claim under Count II is clearly barred by the statute of limitations."

On appeal, Appellants contend their claim against Respondents regarding the McGuire bankruptcy matter was timely under Kansas law. Appellants argue that, under Kansas law, a claim can accrue under four theories – (1) the occurrence rule, (2) the damage rule, (3) the discovery rule, and (4) the continuous representation rule. *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 631, 355 P.3d 667, 673 (2015).

> In the context of a legal malpractice claim, the *Pancake House* court identified four theories which can apply to attorney malpractice in Kansas as to when the accrual of a cause of action occurs and the statute of limitations begins to run.
>
> (1) The occurrence rule—the statute begins to run at the occurrence of the lawyer's negligent act or omission.

(2) The damage rule—the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct.

(3) The discovery rule—the statute does not begin to run until the client discovers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

(4) The continuous representation rule—the client's cause of action does not accrue until the attorney-client relationship is terminated.

The determination of which theory applies depends upon the facts and circumstances of each case.

*Id.* (quoting *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 86, 716 P.2d 575 (1986) (internal quotation marks omitted). "In general, a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises. The true test to determine when an action accrues is that point in time at which the plaintiff could first have filed and prosecuted his action to a successful conclusion." *Pancake House*, 716 P.2d at 579.

Appellants contend their claim was timely under both the discovery rule and the continuous representation rule.

"Our standard of review is *de novo*." *Dumler v. Nationstar Mortgage, LLC*, 585 S.W.3d 343, 348 (Mo. App. 2019).

Discovery Rule

The discovery rule, as set forth in KS ST 60-513 (b), states, in part:

[T]he causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party[.]

In *Martin v. Naik*, the Kansas Supreme Court discussed that the "reasonably ascertainable" exception to the initial act (occurrence) rule was intended for situations where the injury itself

19

could not reasonably be ascertained until sometime after the commission of the act which caused it. 297 Kan. 241, 260, 300 P.3d 625, 636 (2013). Such injuries are latent and progressive in nature with no external or visible sign of harm as opposed to manifest and acute injuries. *Id.* The *Martin* court reaffirmed precedent which concluded that the "exception requires application of an objective standard to determine whether the fact of injury is reasonably ascertainable." 297 Kan. at 261, 300 P.3d at 637. Further, "[t]he phrase 'reasonably ascertainable' presents the injured party with a duty to reasonably investigate available sources containing facts relevant to the party's claim. This is an objective standard based on examining the surrounding circumstances." *Foxfield Villa Associates, LLC v. Robben*, 57 Kan. App. 2d 122, 127, 449 P.3d 1210, 1215 (2019).

Appellants contend that when Appellant Day was advised about the dismissal of the McGuire bankruptcy case, Respondent Hasty took no responsibility for the error. Appellants argue that they only knew the judge ruled in McGuire's favor and that they had no recourse, but did not know Respondents were responsible for the errors and omissions that led to dismissal of the case. Appellants contend that they did not learn that Hasty did not respond to the Motions to Dismiss or that he was responsible for the case against McGuire being dismissed until 2014. Consequently, Appellants contend their suit was timely filed on March 4, 2015, within the two-year limitations period. We disagree.

The record shows that the alleged malpractice injury was clearly obvious and objectively "reasonably ascertainable" in February 2009 when the Bankruptcy Court denied Heartland's Motion to Set Aside the dismissal of its proceeding against McGuire on the grounds that Heartland failed to address its delay in responding to McGuire's dismissal motion and failed to address its delay in seeking to set the dismissal aside. The court's order stated, in part:

20

On December 9, 2008, Plaintiffs filed their motion to set aside the dismissal order. In their motion, Plaintiffs' counsel argued the motion to dismiss for insufficiency of process was misfiled in his office. Plaintiffs' counsel did not mention the other three pleadings which all required responses, nor did he address the subsequent orders disposing of the adversary which were served on both him and his clients.

…

Plaintiffs' case was dismissed generally for failure to prosecute and based on legal authority regarding insufficiency of service. The dismissal was noticed at least twice to counsel and the parties. Plaintiffs fail to address how four pleadings requiring responses were put in a file (which file does not matter) without response deadlines being noted. Plaintiffs fail to address why they waited over four months after entry and notice of the dismissal order to seek relief. The record before the Court is limited to counsel's statement that his office staff misfiled the motion to dismiss. Thus, the record reflects simple case neglect rather than excusable neglect the Court would have to find in order to grant relief.

Respondents advised Appellants of the dismissal and denial of the motion to set aside the dismissal by February 25, 2009, further advising that Appellants had no further recourse against McGuire. The record reflects that Respondent Hasty sent a letter to Appellants in February of 2009, advising of the dismissal. The court's order was enclosed with the letter. The letter advised that the court had overruled the motion for relief from the dismissal. The letter stated that the Court recognized that Appellants' previous counsel had not properly served process. The letter further stated that, 'Sometime later, the file came here and I did not recognize that the original counsel did not properly serve process. Defendant moved to dismiss, and we simply didn't recognize it for what it was and get it in the right file and respond to it." The final paragraph stated, "With this order, my file is being closed. Although the original error was made by your original counsel, we compounded it, and we discussed that previously."

No later than May 28, 2009, Appellants picked up from Respondent's office a complete copy of the McGuire file, including the Bankruptcy Court's order denying Heartland's motion to set aside the dismissal. A reasonable investigation into the McGuire file at that time would have

21

left Appellants with no doubt as to the cause of the McGuire dismissal – that Respondent Hasty allegedly failed to respond to the motion to dismiss and allegedly failed to timely and effectively challenge that dismissal. Therefore, even if the discovery rule applies in this case, the alleged malpractice injury was reasonably ascertainable as early as February of 2009 and no later than May 2009, resulting in the two-year statute of limitations running no later than May 2011. As the Heartland claim was filed by Appellants against Respondents on March 4, 2015, the claim was filed outside the statute of limitations.

<u>Continuous Representation Rule</u>

> The purpose of the continuous representation rule is to avoid unnecessarily disrupting the attorney-client relationship. Adoption of this rule was a direct reaction to the absurd requirement of the occurrence rule which requires the client to sue his attorney even though the relationship continues and there has not been and may never be any damage. The rule, limited to the context of continuous representation, is consistent with the purpose of the statute of limitations which is to prevent stale claims and enable the defendant to preserve evidence. Where the attorney continues to represent the client in the subject matter in which the error has occurred, all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided.

*Dunn v. Dunn*, 47 Kan. App. 2d 619, 645, 281 P.3d 540, 557-558 (2012) (internal quotation marks and citations omitted).

Here, Appellants make the general contention that, after the McGuire matter was concluded, Respondent Hasty "then continued to represent Appellant Day in other matters until Respondent Hasty filed a motion for leave to withdraw as Appellants Day's and Day Advertising, Inc.'s counsel in the Benson matter on October 17, 2013." Appellants contend that, because Appellant Day was a party to the McGuire lawsuit and Respondents represented Day in matters unrelated to the McGuire lawsuit until October 17, 2013, the McGuire claims accrued in October 2013. We disagree.

22

Even if representation in "other matters" could support tolling the statute of limitations under the continuous representation rule, the only representation of Appellants by Respondents which Appellants cite as supporting their continuous representation claim is the Benson litigation. Respondents' representation in the McGuire matter ended in February 2009. The first indication in the record that Respondents were involved in the Benson matter is Appellant Day's deposition testimony acknowledging that Hasty sent Appellant Day a letter on September 10, 2009, discussing that a case against Benson would be difficult to win. The Petition against Benson was filed by Hasty on September 17, 2009. The only date mentioned in Count II of Appellants' petition (the Heartland claim) is October 23, 2013, where Appellants alleged that, "Defendants continued to represent Plaintiffs Day and/or Heartland Title until on or about October 23, 2013."[5] Consequently, nothing in the record shows there was continuous representation of Appellants by Respondents.

We need not address whether continuous representation of a client in unrelated matters could implicate the continuous representation rule because nothing in the record supports that there was any continuous representation of Appellants by Respondents. The record shows that at least six months after Respondents closed the McGuire case, Respondents began representing Appellants in the Benson matter. "When an action is time barred on its face, it must be dismissed unless the statute of limitations was tolled. The plaintiff has the burden of proving facts sufficient to toll the limitations." *Underhill v. Thompson*, 37 Kan. App. 2d 870, 875, 158 P.3d 987, 993 (2007). Appellants failed to do so.

---

[5] The only other date mentioned in the petition is the date Heartland became a Florida corporation.

23

The circuit court did not err in granting summary judgment on Appellants' claim regarding Heartland, as the claim was time-barred on its face and Appellants failed to present sufficient facts showing the limitations period had been tolled.

Point III is denied.

**Point IV – Attorney Fees Paid by Appellant Day**

In their fourth point on appeal, Appellants contend that the circuit court erred in granting summary judgment on the individual claims of Appellant Day and dismissing those claims. Appellants argue that Appellant Day had cognizable claims with allegations of compensable damage against Respondents because the law should recognize general damages and attorneys' fees paid to a negligent attorney as compensable damages in subsequent claims for legal malpractice. Appellants contend that "dismissal of Appellant Day's claims was inappropriate because he stated viable claims with compensable damages, including money spent on attorneys' fees in the previous case and general damages." Appellants further contend that Appellant Day "alleged mental anguish and other general damages" and "alleged that Respondents showed a complete indifference to or conscious disregard for the rights of others and that their actions were outrageous due to evil motive or reckless indifference to the rights of others." Appellants assert that "Day should be allowed to pursue his own claims for damages he has alleged to have suffered."

In moving to dismiss Appellant Day, Respondents argued that Appellant Day lacked standing to assert the claims alleged in the Petition and had not alleged any direct, individual injury, thereby failing to state a claim on which relief could be granted. With regard to the standing issue, Respondents argued that Day had alleged no direct injury as an individual, and all damages alleged were to the corporations. Respondents argued that a shareholder is without standing to sue in his individual capacity for damages to the corporation. With regard to the issue of damages,

24

Respondents' Statement of Fact #6 alleged, "Plaintiff Day has not pled, and cannot show, any individual injury apart from the injuries suffered by the corporate plaintiffs, Day Advertising and Heartland Title." Appellant Day denied this averment stating that his damages included money he paid defendants for legal fees and expenses, that he had to spend money of his own on Heartland Title Services, Inc., and that he "alleged damages including the expense of fees and general damages."

Appellants referenced deposition testimony to support these claims. One reference was to deposition testimony that Day paid $4,500 for an expert in the case. Day testified that he "had a discussion with Mr. Hasty, and he assured me this guy was reputable. And after I gave him $4,500, I don't think he did anything but keep my money."

Appellants also referenced Day's deposition testimony regarding attorney fees paid to Arthur Benson:

Q:     Your arrangement with Mr. Benson, was it a flat fee of 50,000?

DAY:  I don't recall.

Q:     Do you know if you were paying him hourly?

DAY:  I don't recall.

Q:     Do you know where that 50,000 number even came from?

DAY:  Not right offhand I don't, no.

Q:     Do you have bank statements that showed you what he paid him?

DAY:  I don't.

Q:     When you paid Mr. Benson or Mr. Hasty, were you paying from Day Advertising or Jim Day personally?

DAY:  Well, Day Advertising didn't have any assets, so I assume it was me later on.

25

Appellants also cited an affidavit by Day wherein he attested that, "I had to spend money of my own on Heartland Title as a result of its losses," and "Hasty and Associates, LLC, billed me for services."

The circuit court granted Respondents' motion to dismiss Appellant Day stating that, "individual Plaintiff James C. Day has no claim against Defendants."

We find that Appellants presented insufficient evidence to support Appellant Day's claim to have suffered individual damages. "Conclusory allegations are not sufficient to raise a question of fact in summary judgment proceedings. Additionally, mere speculation does not create a genuine issue of material fact; rather, the record must demonstrate factual questions that would permit a reasonable jury to return a verdict for the non-moving party." *Midwest Coal, LLC ex rel. Stanton*, 378 S.W.3d at 374.

On appeal, Appellants only generally assert that Appellant Day suffered damages in the form of paying attorney fees, but do not discuss what evidence in the summary judgment record supports these damages. The summary judgment record shows that Appellant Day's claims were vague, speculative, and supported with no documentary evidence. Day contends Respondents damaged him because Hasty recommended an expert who charged Day $4,500, and Day does not believe the expert helped his case. Without more, the contention that Hasty caused $4,500 in damages by recommending the expert is purely speculative. Further, Day claims Respondents damaged him because he allegedly paid $50,000 to a negligent lawyer, with Respondents allegedly negligently handling the case against that negligent lawyer. Yet, Day could not say where the $50,000 allegedly paid to Benson came from, had no bank statements supporting the payments, and had no evidence as to how much Day himself paid Benson. Day stated that he could only

26

"assume" it was Day who made payments "later on."  Appellant Day's testimony that he had to spend his own money "on Heartland Title as a result of its losses" in no way directly implicated Respondents as nothing in the record showed that McGuire would have been held liable for those losses had Respondents not allegedly mishandled the McGuire bankruptcy matter.  Further, Day's statement that Respondents billed him for their services was no proof that he personally paid for those services and that the source of funds was not the corporation he was sole shareholder of.[6]

We conclude that the circuit court did not err in granting summary judgment to Respondents and dismissing Appellant Day's individual claims as Appellant Day presented insufficient evidence from which a reasonable juror could conclude that he suffered individual damages.

Point IV is denied.

**Point V – Fraudulent Misrepresentation Claims**

Appellants contend in their fifth point on appeal that the circuit court erred in granting summary judgment on their claim of fraudulent misrepresentation, arguing that genuine issues of material facts existed that precluded judgment as a matter of law.  Appellants contend that they set forth evidence from which a reasonable juror could infer that Respondents did not intend to pursue Appellants' claims in a trial.  Appellants claim Respondent Hasty intended to deceive Appellants at the time of contracting because Hasty had no intention of taking Appellants' claims to trial but

---

[6] In Appellants' reply brief, Appellants contend that Respondents filed a Statement of Facts wherein they alleged, and Appellants admitted, in Fact No. 43 that, "James Day received and paid Defendants' invoice for their handling of the McGuire Matter."  This admission, however, does not include the source of the funds from which Appellant Day paid Defendants.  Regardless, even if Fact No. 43 could be considered evidence of Appellant Day's individual damages claim, Appellants did not cite to this admitted Fact in Response to Respondents' Motion for Summary Judgment such that the circuit court could consider this claim.  Under Rule 74.02(c)(2), all denials must be supported by appropriate citation to exhibits, affidavits, or other discovery documents. *Central Trust and Inv. Co. v. Signalpoint Asset Management, LLC*, 422 S.W.3d 312, 322 n.10 (Mo. banc 2014).

convinced Appellants to the contrary. The court, in ruling in Respondents' favor in their motion for summary judgment, found that "…Plaintiff Day Advertising Inc. has not presented any admissible evidence on Count III which would prove a present fraudulent intent on the part of Defendants at the time Day Advertising Inc. engaged the services of Defendants to represent Day Advertising, Inc."

The elements of fraudulent misrepresentation are:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

*Stevens v. Markirk Construction, Inc.*, 454 S.W.3d 875, 880 (Mo. banc 2015) (internal quotation marks and citations omitted). "When a fraud claim is based on a statement of intent, the plaintiff establishes falsity by showing that when the statement was made, the speaker did not intend to perform consistently with the statement." *Renaissance Leasing, LLC v. Mermeer Mfg. Co.,* 322 S.W.3d 112, 133 (Mo. banc 2010). "Absent such inconsistent intent, there is no misrepresentation of fact or state of mind but only a breach of promise or failure to perform." *Id.*

To support the contention that Respondent Hasty represented to Appellant Day at the time of contracting that he intended to take the case to trial, Appellants cite Appellant Day's deposition testimony:

Q:      And Mr. Hasty had some reservations about your case from day one, didn't he?

DAY:  I don't believe so.

Q:      Okay. And why do you say that?

28

DAY: I think when he first took it, he thought it was a very good case, and he related that to me.

Q: What do you recall him telling you about why he thought it was a great case?

DAY: I don't recall.

Q: What conversations do you believe or do you recall that makes you believe he thought it was a great case?

DAY: He thought that, as I recall, that Benson made massive mistakes.

Q: Do you recall the difference – or any conversations with Mr. Hasty, between a mistake and malpractice?

DAY: No.

Q: Do you know what malpractice is?

DAY: I would assume that malpractice to an attorney would mean that they did something or failed to do something that a competent attorney would absolutely do.

Q: Okay. Have you ever heard the term 'standard of care?'

DAY: I've heard it.

Q: Do you believe Mr. Hasty violated the standard of care of a normal lawyer?

DAY: Yes.

Q: Have you spoke to any experts or any other lawyers regarding whether Mr. Hasty committed malpractice? Other than Mr. Burnett?

DAY: I may have, but I don't have any – any recollection.

Q: You don't remember any lawyers' names?

DAY: No.

Q: Okay. Can you refer back to Exhibit 2? Earlier I asked you if Mr. Hasty expressed reservations about your case, and you said you didn't believe so. Exhibit 2 is a correspondence dated September 10, 2009, correct?

DAY: That's what it says.

Q: And that's before the petition against Mr. Benson was even filed, correct?

DAY: I don't know.

Q: Well, I'll represent to you that the petition filed against Mr. Benson was filed on September 17, 2009. So this would be one week before, correct?

DAY: It would be.

Q: What's this 110 South Cherry, Suite 103, what is that?

DAY: Heartland Title's Office.

Q: Okay. Is that where you were officing at back in 2009?

DAY: I would assume so.

Q: If you go down to the next to the last paragraph, it starts with, 'A case… A case against Benson will be difficult to win.' Did I read that correctly?

DAY: Yeah.

Q: 'Under these circumstances, I question the advisability of your spending $10,000 since we know that 10,000 is not going to get you where you want to be.' Did I read that correctly?

DAY: Yes.

Q: So prior to that petition being filed against Mr. Benson, he was expressing his reservations about your claim against Mr. Benson, wasn't he?

DAY: I don't recall receiving this letter.

Q: Do you dispute receiving it?

DAY: No. I just don't recall it.

Q: If you go up to the paragraph two paragraphs above that, I think that's the language that you recall that you testified to. It says, 'As we discussed, I don't think the lawyer did a good job in representing you.' Did I read that correctly?

DAY: You did.

30

Q:      'However, getting a good result against the lawyer now requires you to not only show the lawyer did not do a good job and was, in fact, negligent.' Did I read that correctly?

DAY:  You did.

Appellants also cite the following deposition testimony:

Q:      All right.  Is it your contention that Mr. Hasty never intended to try this case?

DAY:  I don't believe Mr. Hasty ever intended to try this case, no.

Q:      Based on what?

DAY:  Based on he didn't get expert witnesses.  He didn't get witnesses of any kind.  He started out, when I first retained him, very positive about the case, got more negative as it went on.  Seemed to make it as difficult and expensive as he could make it, I think to force me to walk away from it and he keep all the thousands of dollars that I paid him.

At the mediation that we had with Benson he took their side and basically said I didn't have a case.  So he got aggressively more negative and I don't believe he ever intended to try this case.  And he certainly couldn't try this case without doing what he needed to do with experts and witnesses, which he didn't do.

Q:      You just stated that Mr. Hasty was positive about your case from the beginning.  Did I restate you correctly?

DAY:  He was in the beginning, not from the beginning.

Q:      In the beginning you claim that he was positive about the outcome that you might obtain on this Day v. Benson matter, is that what you're stating?

DAY:  Yes.  If he wasn't I wouldn't have retained him.

Q:      Are you 100 percent sure he was positive at the beginning of this case?

DAY:  He told me I had a good case or he wouldn't have taken it.

31

Appellants also cite to Respondent Hasty's deposition testimony wherein Hasty was asked questions about his representation in the suit against Benson for allegedly mishandling Appellants' suit against DeVries, Jones, and DeVries & Associates. When asked what kind of investigation Respondents did into Appellants' allegations regarding DeVries and Jones, Hasty responded: Well, we had the entire trial transcript. We had Mr. Benson's file, we had Mr. Day's file and we had Mr. DeVries' file. Investigative experts as we discussed. Talked to Mr. Gaston. Read the court files. That's what I remember. Took Mr. Benson's deposition." Hasty testified that he already had DeVries' and Jones' depositions and trial testimony. When asked why he did not take additional depositions of the two, Hasty testified that he saw no benefit and the downside of tipping off the witnesses as to what to expect at trial. Hasty testified he did not subpoena them for trial because "we didn't get to that point." When asked when he withdrew from Appellant Day's case he replied, "The same day he told me to." When asked what the circumstances were of Day telling Hasty to withdraw, Hasty testified:

HASTY:     He was in my office and I can't remember precisely why because it was after mediation. He was very disappointed. He had convinced himself this case would settle. He was disappointed that – well, he told me early on that he thought it ought to cost about $10,000 to get this case to the point that he could settle it and I tried to convince him that that wasn't accurate, that that wasn't going to happen, it would cost a lot more than that. He said he knew [M.D.], that she had settled a case before. He said she was weak and I told him that this wasn't going to be [M.D.'s] decision, that this is the client or the clients' insurance carrier but not the lawyers. And then he said, (transcript provided with record does not provide complete statement).

…

Q:     Do you remember what you had done to prepare for trial prior to withdrawing?

32

HASTY:          Well, we did all those things I've referenced. We had taken the deposition of Mr. Benson and I – boy, I'd have to go through the whole file to detail all that for you.

Hasty testified that he expected that DeVries, Jones, Appellant Day, Dr. Kelsey (economist), and a Mr. Pingelton would testify. When asked if he had spoken with DeVries or Jones to make sure they would be present for trial, Hasty testified, "I wasn't worried about that, I was going to give a subpoena to them." Hasty testified he would not need to subpoena Pingelton to secure his attendance. Hasty testified he had not yet subpoenaed Dr. Kelsey.

We find that Appellants presented insufficient evidence from which a reasonable juror could conclude that Respondent Hasty represented to Appellants at the time of contracting that he intended to take the matter to trial, and knew that representation was false at the time he began representing Appellants. Appellant Day's testimony that Hasty was initially positive about his case, but soured on the case's prospects as time went on, was simply insufficient to support that, at the time of contracting, Hasty never intended to try the case. Appellants suggest that this positivity was merely a ruse, and proof of Hasty's initial intent not to litigate the case is in his lack of preparation for trial. Appellants state in their appeal brief that Hasty, "moved to withdraw from the Arthur Benson case on October 17, 2013, mere weeks before the November 4, 2013 trial date" without arranging for attendance of any of the non-expert witnesses. Yet, the record reflects that Appellant Day asked Hasty to withdraw from the case and that, had Hasty continued on with the case, he planned to serve subpoenas on witnesses to secure their presence for trial. Hasty's testimony was that he had done several things in preparation for trial.

The circuit court did not err in granting summary judgment to Respondents on Appellants' claim of fraudulent misrepresentation in that Appellants produced insufficient evidence that Hasty induced Appellants to engage Hasty's services through a false representation.

33

Point V is denied.

## Point VI – Severed Claims

In Appellants' sixth point on appeal, Appellants contend the circuit court abused its discretion in severing Appellants' claims for trial after dismissing Appellant Day's individual claims, arguing the claims were not misjoined and should not have been severed because all claims arose from the same series of transactions or occurrences. Appellants contend that the claims were properly joined because Respondents operated a business and profession in which they represented all Plaintiffs, and contend their representation of different parties in unrelated matters constituted a common question of law or fact. Appellants argue that Appellant Day was a client in all of the claims, and Appellant Day paid the legal fees. Appellants state that facts common to all of the claims include Respondents' representation, Appellant Day's payment of legal fees, and the resultant damages from the payment of fees. Further, Appellants contend several witnesses would testify regarding multiple counts. Appellants contend that liability expert, Ted Frapolli, would testify regarding both malpractice claims, economics expert Kelsey was involved in multiple claims, and Respondents' liability expert was the same in both claims.

"[T]he trial court has broad discretion in deciding whether and when to sever properly joined claims, and its decisions in that regard should be affirmed as long as they are rationally related to the goals of efficiency and expeditiousness underlying Rule 52.05(a)." *Barron v. Abbott Laboratories, Inc.*, 529 S.W.3d 795, 803 (Mo. banc 2017). "The decision of whether to allow severance of claims is within the sound discretion of the trial court, and we will not disturb the ruling of the court absent an abuse of discretion." *Guess v. Escobar*, 26 S.W.3d 235, 239 (Mo. App. 2000). "A discretionary ruling is presumed correct, and an abuse of discretion only occurs where we find the ruling is clearly against the logic of the circumstances and so arbitrary and

34

unreasonable that it shocks the sense of justice." *Id.* "[A]n error does not warrant reversal on appeal unless the error results in prejudice." *Barron*, 529 S.W.3d at 798; *See also* Rule 84.13(b).

As we find the court properly granted summary judgment to Respondents on all claims, we need not address this point because, even if the court erred in severing the claims for trial, no prejudice can result where there will be no trial.

Point six is denied.

**Conclusion**

We conclude that, 1) the circuit court did not err in granting summary judgment on the claim regarding Day Advertising by allegedly improperly considering damage caused by Eric Johnson in its ruling as the issue of damages caused by Eric Johnson was before the court, 2) the circuit court did not err in granting summary judgment on the claim regarding Day Advertising as Appellants presented insufficient evidence from which a reasonable juror could determine what damages, if any, Eric Johnson caused Day Advertising, 3) the circuit court did not err in granting summary judgment on the claim regarding Heartland as no genuine issue of material fact existed as to whether the claim was timely filed, 4) the circuit court did not err in granting summary judgment on the individual claims of James Day, as Appellant Day presented insufficient evidence from which a reasonable juror could conclude that Day suffered individual damages, 5) the circuit court did not err in granting summary judgment on Appellants' claim of fraudulent misrepresentation as Appellants presented insufficient evidence from which a reasonable juror could conclude that Respondent Hasty represented to Appellants at the time of contracting that he intended to take the matter to trial, and knew that representation was false at the time he began representing Appellants, and 6) we need not determine whether the circuit court erred in severing

Appellants' claims for trial after dismissing Day's individual claims, as we affirm the circuit court's summary judgment rulings and no prejudice can result where no trial will be had.

 

 

 

 

 

 

_____
Anthony Rex Gabbert, Judge

All concur.